Kevin ARMSTRONG and Kraig Armstrong, minors, by Roosevelt Savage and Rochelle Savage, their parents and next friends, Mary Lou Hicks and Presten Hicks, minors, by Paul L. Hicks and Rose B. Hicks, their parents and next friends, Jean Robinson, by Alonzo Robinson and Theresa Robinson, their parents and next friends, and Andrew Smith, Grantley H. Smith, and Kermit Smith, minors, by Kenneth L. Smith and Phyllis G. Smith, their parents and next friends, Plaintiffs,

v.

BOARD OF SCHOOL DIRECTORS OF the CITY OF MILWAUKEE, James F. Koneazny, Thomas Brennan, Anthony S. Busalacchi, Margaret Dinges, Gerald P. Farley, Stephen Jesmok, Jr., Marian McEvilly, Maurice J. McSweeney, Edward S. Michalski, Lawrence J. O'Neil, Evelyn T. Pfeiffer, Lorraine M. Radtke, Lois Riley, Doris Stacy, and Leon W. Todd, Jr., Members of the Board of School Directors of the City of Milwaukee, Lee R. McMurrin, Superintendent of Schools of the City of Milwaukee, and Thomas A. Linton, Secretary-Business Manager of the Board of School Directors of the City of Milwaukee, Defendants,

Milwaukee Teachers' Education Association, Undesignated Intervenor.

Civ. A. No. 65–C–173.

United States District Court,
E. D. Wisconsin.

May 4, 1979.

See also D.C., 471 F.Supp. 827.

802

Lloyd A. Barbee, Milwaukee, Wis., for named plaintiffs.

Irvin B. Charne, Milwaukee, Wis., for absent members of the plaintiff classes.

L. C. Hammond, Jr., Patrick W. Schmidt, and Ronald E. Klipsch, Milwaukee, Wis., for defendants.

Curry First, Milwaukee, Wis., for Milwaukee Teachers' Education Association, undesignated intervenor.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

### I. *Introduction*

This is an action brought pursuant to 42 U.S.C. § 1983 challenging the defendants' alleged unconstitutional actions in creating and maintaining unlawful racial segregation in the City of Milwaukee public school system. The court has jurisdiction under 28 U.S.C. § 1343.

On January 19, 1976, the Court issued a decision and order finding the defendants liable for the constitutional violations alleged in the amended complaint. *Amos v. Board of School Directors of the City of Milwaukee*, 408 F.Supp. 765 (E.D.Wis.1976). Following affirmance of that decision by the Seventh Circuit Court of Appeals, *Armstrong v. Brennan*, 539 F.2d 625 (7th Cir. 1976), the decision was vacated and remanded by the United States Supreme Court to the court of appeals for reconsideration in light of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Dayton Board of Education v.*

*Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), see *Brennan v. Armstrong,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977), and the court of appeals thereafter remanded the case to this court for proceedings consistent with the Supreme Court's mandate. *Armstrong v. Brennan,* 566 F.2d 1175 (7th Cir. 1977).

The Court has proceeded in three phases with its reconsideration of the case:

First, the Court took additional evidence on the issue of past intentional discrimination. On June 1, 1978, the Court found: "* * * that the defendants discriminated against the plaintiffs with segregative intent * * * and in so doing violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983." *Armstrong v. O'Connell,* 451 F.Supp. 817, 820 (E.D.Wis.1978).

The Court also found:

"F–89. * * * [D]efendants undertook a systematic program designed to prevent whites from being required to attend classes with large numbers of blacks." *Armstrong v. O'Connell, supra,* at 866.

Second, on July 10, 1978 through July 14, 1978, and on October 23, 1978 through October 25, 1978, the Court took evidence on the issue of the present effects of defendants' past segregative acts. On February 8, 1979, the Court found:

"L–2. * * * [D]efendants' constitutional violations had an incremental segregative effect throughout the school system.

"L–3. In order to redress the pervasive, systemwide impact of defendants' constitutional violations, a systemwide remedy encompassing both student population and teacher assignment is required." *Armstrong v. O'Connell,* 463 F.Supp. 1295, 1309 (E.D.Wis.1979).

Finally, in its February 8, 1979, decision and order, the Court established a schedule for submission by the parties of proposed remedial plans, and it scheduled a hearing to commence March 23, 1979, on the issue of the appropriate remedy to be imposed.

In lieu of proposed remedial plans, on March 1, 1979, the plaintiffs and defendants submitted to the Court a proposed agreement (attached hereto as Appendix A) for settlement of all issues remaining in the case with the exception of the issue of a teacher assignment remedial plan, and a motion for approval of the settlement agreement, which motion is the subject of this decision and order.[1] For the following reasons, the motion is granted and the settlement agreement is approved.

## II. *Settlement of a Class Action*

Rule 23(e) of the Federal Rules of Civil Procedure provides:

"(e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

The Seventh Circuit has recognized that the essence of a settlement is compromise and that one of the benefits obtained from it is avoidance of the need for court resolution of disputed issues. *In Re General Motors Corporation Engine Interchange Litigation,* 594 F.2d 1106 at 1132, n. 44 (7th Cir. 1979); *Patterson v. Stovall,* 528 F.2d 108, 112, 114 (7th Cir. 1976); *McDonald v. Chicago Milwaukee Corporation,* 565 F.2d 416 (7th Cir. 1977). Nevertheless, before it can approve a settlement proposal, the Court must be satisfied that the settlement is fair, reasonable, and adequate. *In Re General Motors,* supra, at 1122; *In Re Clark Oil & Refining Corporation Antitrust Litigation,* 422 F.Supp. 503 (E.D.Wis.1977). The propo-

1. The parties and the undesignated intervenor, the Milwaukee Teachers' Education Association ("MTEA"), attempted to resolve by agreement the issue of a teacher assignment remedial plan. Their efforts were not successful. In-

stead, the Court received one proposed plan from the parties and another from the MTEA. The issue is decided by the Court in a separate decision and order issued today.

nents of the settlement bear the burden of persuasion on the issue of fairness. *In Re General Motors*, at 1126, n. 30; *Manual for Complex Litigation* § 1.46 at 56 (1977 ed.) (Wright & Miller) (hereafter "*Manual*").

 Among the factors which the Court should consider in judging the fairness of the proposal are the following:

"(1) ' * * * the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement';

"(2) '[T]he defendant's ability to pay';

"(3) '[T]he complexity, length and expense of further litigation';

"(4) '[T]he amount of opposition to the settlement';"

*Manual*, supra, at 56.

Professor Moore notes in addition the factors of:

"(1) * * *

"(2) Presence of collusion in reaching a settlement;

"(3) The reaction of members of the class to the settlement;

"(4) The opinion of competent counsel;

"(5) The stage of the proceedings and the amount of discovery completed."

3B Moore's *Federal Practice* ¶ 23.80[4] at 23–521 (2d ed. 1978).

The most important of the factors is number "(1)" from the *Manual* listed above; that is, the strength of the plaintiff's case on the merits as compared to what is offered in settlement. *Manual* at 56; 3B Moore's at 23–521; *In Re General Motors*, at 1132, n. 44.

 The decision to accept or reject the settlement proposal is one within the discretion of the district court. *In Re Clark Oil*, supra, at 507; *Manual* at 57; *Ace Heating & Plumbing Company v. Crane Company*, 453 F.2d 30 (3d Cir. 1971). If the Court finds that the settlement is fair, it may accept it over the objection of some class members, *In Re General Motors*, at 1134, and also, although the issue does not arise in this case, over the objection of named class representatives. *In Re General Motors*, at 1128, n. 34 and 1134; *McDonald*,

supra, at 426. The Court cannot, however, modify the terms of a settlement proposal; it can only accept or reject the proposal as presented to it. *In Re General Motors*, at 1125, n. 24.

In the *Manual* it is recommended that the court follow a two-step procedure, which the Seventh Circuit has endorsed, *In Re General Motors*, at 1133, in regard to a settlement proposal:

" * * * The first step involves a preliminary determination as to whether notice of the proposed settlement should be given to members of the class and a hearing scheduled at which evidence in support of and in opposition to the proposed settlement will be received. Unless the judge is preliminarily satisfied that the proposed settlement is within the range of possible approval, there is no point in proceeding with notice and a hearing.

\* \* \* \* \* \*

"Such a preliminary hearing is not, of course, a definitive [sic] proceeding on the fairness of the proposed settlement * * *. * * * [I]t is simply a determination that there is, in effect, 'probable cause' to submit the proposal to members of the class and to hold a full scale hearing on its fairness at which all interested parties will have an opportunity to be heard after which a formal finding of fairness will be made." *Manual* at 53–55.

Assuming that a finding of probable cause is made and notice is given to members of the class:

"At the hearing itself, every effort should be made not only to hear all interested parties desiring to be heard, but to adduce all information necessary to enable the judge intelligently to rule on whether the proposed settlement is 'fair, reasonable, and adequate.' * * *" *Manual* at 57.

In this case, the Court on March 5, 1979, held a pre-fairness hearing at which counsel for the parties stated to the Court their reasons for supporting the settlement. After considering those statements and the

papers previously submitted, the Court found that the settlement proposal was within the range of possible approval and found probable cause to have notice of the terms of the settlement sent to the class members. (See the order filed March 6, 1979.)

Copies of the notice (attached hereto as Appendix B), the form and content of which were approved by the Court, were sent to all members of the plaintiff class on March 14, 1979, and the notice was published in the following newspapers on the following dates:

| Name of Newspaper | Dates of Publication |
| --- | --- |
| The Milwaukee Journal | March 13 and 19, 1979 |
| Milwaukee Sentinel | March 12 and 16, 1979 |
| The Milwaukee Courier | March 10 and 17, 1979 |
| The Milwaukee Star | March 15 and 22, 1979 |
| The Milwaukee Community Journal | March 14 and 21, 1979 |

(See the affidavits of L. P. Sensenbaugh, Jr., Carl Hubbard, and Jimmie L. Ewing, filed March 26, 1979.) The notice set forth a brief history of the case, the terms of the settlement proposal, minimum faculty desegregation goals, and also the date of the scheduled fairness hearing and the procedure to be followed by persons wishing to make written or oral objection to the terms of the settlement agreement.

The fairness hearing commenced on March 26, 1979, and continued on March 27 and on the afternoon of March 29, when the parties presented to the Court additional information which it had requested at the close of the hearing on March 27 about the probable consequences of the settlement agreement on the racial composition of the Milwaukee public schools through July 1, 1984, when the agreement by its terms will expire. During the hearing the Court heard statements from all counsel; received testimony from School Superintendent Lee McMurrin, School Board President Anthony Busalacchi, Attorney Howard Pollack, and Dr. Robert Long; received numerous exhibits; and heard testimony from forty-five persons, most of them opposed to the settlement, who appeared in response to the notice of the agreement previously published and sent out to members of the plaintiff class. The Court also received and has considered written statements of position on the settlement proposal from numerous persons, and written notice from all named plaintiffs that they are aware of the terms of the settlement agreement and favor its acceptance.

At the conclusion of the hearing on March 29, 1979, the Court took the settlement proposal under advisement. For the reasons set forth in Part III below, the Court approves the agreement as being fair, adequate, and reasonable, and in the best interests of the plaintiff class members.

### III. The Settlement Agreement

■ In reaching its decision to approve the settlement agreement, the Court has considered the strength of the plaintiff's case on the merits as compared to what is offered in settlement, the complexity, length and expense of further litigation, the present stage of the proceedings and the amount of discovery completed, the amount of opposition to the settlement agreement and the reaction of members of the class to it, the possibility of the presence of collusion between opposing counsel, and the opinion of counsel on the agreement. The Court has also considered the reasonableness of the attorneys' fees which will be paid to plaintiffs' counsel under the agreement. The factor of defendants' ability to pay is not relevant to this case.

The case has been in progress for fifteen years, and the school system has been under court order for three years. Since the original liability decision was issued on January 19, 1976, the case has been appealed to the Seventh Circuit and to the Supreme Court and has been retried by this Court. Counsel and the Court are fully aware of the nature of the litigation and the proof available, and have fully explored the legal issues raised by the case. Nevertheless, this is complex litigation and it arises in an area of the law which is still in the process of development. The Supreme Court has recently granted certiorari in three cases. See *Brinkman v. Gilligan*, 583 F.2d 243 (6th Cir. 1978), cert. granted sub nom. *Dayton*

*Board of Education v. Brinkman,* —— U.S. ——, ——, 99 S.Ct. 831, 59 L.Ed.2d 31 (1979); *Penick v. Columbus Board of Education,* 583 F.2d 787 (6th Cir. 1978), cert. granted —— U.S. ——, ——, 99 S.Ct. 831, 59 L.Ed.2d 31 (1979); *Tasby v. Estes,* 572 F.2d 1010 (5th Cir. 1978), cert. granted —— U.S. ——, 99 S.Ct. 1212, 59 L.Ed.2d 454 (1979). The first two cases involve the application of reduced standards of proof for plaintiffs in school desegregation actions, and the third raises the issue of whether or not a systemwide remedial plan imposed in a large urban school district may allow for the continued existence of one-race schools. If the settlement proposal were not approved, the decisions rendered in those cases could well affect the future course of litigation in this action. The likelihood of further appeals and further proceedings at the district court level would be correspondingly high, as would be the likelihood of substantial delay in the implementation of a final remedy. Thus, the complexity, length, and expense of future litigation is a factor which weighs in favor of approval.

The stage that the proceedings have reached is also relevant in that it enables the Court and counsel to evaluate fully the resolution of the case which the settlement provides as compared to the strength of the plaintiffs' case on the merits. As stated above, this is the most significant of the factors which a court should consider. *In Re General Motors,* supra, at 1132, n. 44.

In its June 1, 1978, decision and order, the Court held that the defendants discriminated against the plaintiff class in an unlawful manner with the goal of preventing white children from having to attend school with large numbers of black children. In its February 8, 1979, decision and order, the Court held that the defendants' unconstitutional conduct has had a systemwide effect and necessitates a systemwide remedy. The Court did not, however, decide whether or not a systemwide remedy in turn requires that every school in the Milwaukee public school system have a particular racial balance.

In *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), involving the remedy to be imposed in the case of a dual school system created and maintained by state action, the Court stated at 24, 91 S.Ct. at 1280:

" * * * If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."

See also *Milliken v. Bradley,* 418 U.S. 717, 740, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Tasby v. Estes,* supra. The exhibit to the settlement agreement reached in this case provides in part as follows:

"II. STUDENT DESEGREGATION

"(A) Any student desiring to attend a 'desegregated' school as defined in II(D) shall have the right to do so, and defendants shall annually advise all students in writing of this right.

"(B) Defendants shall continue to implement the student transfer policies and procedures now in effect, the terms of which are contained in the Appendix attached hereto.

"(C) Defendants shall, during the pendency of this order, assign students in good faith with the goal of having at least the following number of students enrolled in schools within the Milwaukee Public School System ('system') which are desegregated as defined in paragraph (D) below:

"(1) When the system percentage of blacks is 50% or less, three-fourths of the 'base number' of students or

"(2) When the system percentage of blacks is more than 50%, three-

fourths of the 'base number' of students times a fraction consisting of the number of non-black students over the number of black students.

"(D) A 'desegregated' school for purposes of student desegregation is defined as:

"(1) Each elementary or junior high school which has a student population composed of not less than 25% and not more than 60% black students and

"(2) Each senior high school which has a student population composed of not less than 20% and not more than 60% black students.

"(E) The 'base number' upon which to compute the number of students to be in desegregated schools each year will be all students in the system with the exception of:

"(1) Kindergarten and pre-kindergarten students,

"(2) Exceptional education students attending schools devoted exclusively to exceptional education, and

"(3) Those students enrolled in Vieau, Allen-Field, Kagel and Kosciuszko, as long as these schools have a bilingual education program.

"(F) Each elementary and junior high school (except those specified in paragraphs II(E)(2) and (3)) will have either:

"(1) A minimum black student enrollment of 25% or

"(2) Where the school has a bilingual education program, a minimum combined minority enrollment (as defined by the United States Department of Health, Education and Welfare) of 25% with at least 12.5% black students and at least 12.5% other minority students.

"(G) All senior high schools which do not meet the requirements of Paragraph II(D)(2) will have a minimum of 250 black students.

"(H) Nothing in this order prevents defendants from having more students than the number specified in II(C) attending desegregated schools.

"(J) Defendants shall develop and implement a human relations program for students, the objectives of which shall be to aid the achievement of quality education and successful desegregation and integration, and the details of which shall be within the sole discretion of defendants. This program shall be implemented in each school year during which this order remains in effect."

The amici curiae in a brief and supplementary brief filed March 23, 1979 and March 29, 1979, have predicted that as a result of this portion of the settlement agreement, by July 1, 1984, when the agreement expires and by which time it is predicted that the school system will be 60% black, 79.6% of the black school children in Milwaukee could be attending schools which were not "integrated" as defined in the agreement. Amici have also expressed, and the Court has had, concerns about that portion of the agreement which provides that the defendants shall assign students "in good faith" in attempting to reach the desired goals.

In response to a request from the Court that it be provided with more information about the projected numbers and percentages of black children who would be attending schools which are not desegregated as defined in Part II(D) of the exhibit to the settlement agreement, Dr. Richard Long testified on March 29, 1979. He prepared three exhibits which are theoretical projections of the most probable, the minimum, and the maximum desegregation of students within the Milwaukee public school system for the years 1979–1983. (See Exhibits 50, 51, and 52.) The Court has prepared a composite of the exhibits which is attached to this decision as Appendix C. Attorney Howard Pollack also testified about the probable effects of Part II of the

exhibit to the settlement agreement. (See Exhibit 55, presented in court March 29, 1979.)

To use as an example the last school year which will be covered by the settlement agreement, Dr. Long testified that for 1983 there is a projected total enrollment within the Milwaukee public school system of 75,-726 students. Subtracting the projected number of kindergarten and pre-kindergarten children, the projected number of exceptional education students who will be attending schools devoted exclusively to exceptional education, and the projected number of students enrolled in Vieau, Allen-Field, Kagel, and Kosciuszko, assuming that those schools will still have a bilingual educational program, there is a projected "base" enrollment as defined in Part II(E) of the exhibit to the settlement agreement of 66,127 students, 55.9% of whom will be black.

Dr. Long calculated, based on the projected "base" enrollment of 66,127 students for the school year commencing in 1983, that the minimum possible percentage of all students required to attend desegregated schools in order for the system to satisfy Part II of the exhibit to the agreement will be 59.2%; that the minimum possible percentage of students by race attending desegregated schools will be 29.49% of the black students and 100% of the nonblack students; that the maximum possible percentage of students by race attending desegregated schools will be 100% of the black students and 100% of the nonblack students; and that the most probable percentage of students by race who will be attending desegregated schools will be 63.5% of the black students and 93.3% of the nonblack students.

Dr. Long performed similar calculations reflecting total enrollment and "base" enrollment and the minimum, most probable, and maximum percentages of students who will be attending desegregated schools for the years 1979–1982. The results of his calculations are set forth in Appendix C.

Dr. Long further testified that based on the present distribution of students within the system, the minimum projections are a realistic impossibility, since the distribution of students already made for the fall of 1979 is far above the minimum projected and since the trend which has been in effect for the last three years is toward increasing desegregation, meaning that in order to achieve the minimum projections the defendants would have to mandatorily reassign black children in massive numbers out of presently desegregated schools. Dr. Long testified that the maximum projections are also a realistic impossibility since they would require massive mandatory reassignment of students, and since by the 1983–84 school year, the projection could be achieved only if there were a perfect distribution of students within the Milwaukee public school system joined with the assignment of some black students to suburban public school systems.[2] Mr. Pollack's testimony and projections were essentially in accord with those of Dr. Long.

In addition, the Court notes that Part I of the exhibit to the settlement agreement is

2. For the purpose of achieving the most effective remedy for members of the plaintiff class, it would certainly make sense to include metropolitan Milwaukee school districts within the remedy for the City of Milwaukee public school system. *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), forbids this approach, however, except in cases where the outlying school districts have been authorized to intervene and present evidence in the action, and where it has been shown "that there has been a constitutional violation within one district that produces a significant segregative effect in another district. * * * [i.e.,] that racially discriminatory acts of the state or local school districts, or of a single school district

have been a substantial cause of interdistrict segregation. * * * " 418 U.S. at 745, 94 S.Ct. at 3127. See also *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), wherein the Court held that a state's educational financing system which results in differential spending levels per pupil in different school districts is constitutional so long as "no charge fairly could be made that [as a result of the differential spending] the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." 411 U.S. at 37, 93 S.Ct. at 1299.

an injunction provision which states in part that the defendants:

"* * * are hereby permanently enjoined from discriminating upon the basis of race in the operation of the public schools of the City of Milwaukee with respect to any matter which was the subject of this litigation."

Also, Part II of the exhibit to the agreement provides in part:

"(A) Any student desiring to attend a 'desegregated' school as defined in II(D) shall have the right to do so, and defendants shall annually advise all students in writing of this right."

These two provisions are as much a part of the agreement as the formula and guidelines for student desegregation.

Amici curiae, in the brief filed March 23, 1979, at 17–18, have formulated the problem presented by the student desegregation portion of the settlement agreement as follows:

"The United States Supreme Court has made it quite clear that there is no substantive constitutional right to a particular degree of racial balance or mixing. *Milliken v. Bradley,* 433 U.S. 267, 280 fn. 15, [97 S.Ct. 2749, 53 L.Ed.2d 745]. The question in this case, however, is not a substantive right to a particular racial balance. The question is whether or not a remedy which allows for a substantial percentage of the students to continue to attend all black schools will sufficiently remedy the effects of an intentional policy of encouraging racial identifiability of schools and an intentional policy of insulating white students from having to go to school with a large number of blacks."

While the Court recognizes that a substantial number of black students, and possibly as many as 35% or more,[3] may not be attending desegregated schools in 1983–84, see Appendix C, the Court is persuaded, based on the testimony of Dr. Long and Mr. Pollack, and in view of the injunction provision contained in the settlement agreement, that the dire predictions of amici will not be fulfilled, and, furthermore, that their fulfillment would mean that defendants had engaged in conduct violative of the settlement agreement and unlawful under the Fourteenth Amendment to the United States Constitution.

The Court is further persuaded, for the reasons just mentioned and in view of the provision of the settlement agreement guaranteeing to every black or white student who desires it the right to attend a desegregated school, that the settlement agreement does address itself to the constitutional violations found in the Court's June 1, 1978, decision and order and furthers the goal of remedying the defendants' past practice of insulating white children from having to attend school with large numbers of black children.[4] Therefore, the Court finds that when compared to the strength of plaintiffs' case on the merits, the solution that is offered in the settlement agreement is fair, reasonable, and adequate to protect the plaintiffs' right to a remedy for the defendants' past constitutional violations.

The settlement agreement also provides for the appointment of a five-member panel, designated the monitoring board, which shall have jurisdiction over complaints made by individual members of the plaintiff class relative to defendants' com-

---

**3.** Dr. Long also testified that in view of the present degree of racial balance in the school system, many of the black children who in 1979–84 will not be attending schools which are "desegregated" under the definition contained in Part II of the exhibit to the settlement agreement will be attending schools which are only slightly outside of the 25–60% range for elementary and junior high schools and the 20–60% range for senior high schools.

**4.** Paragraphs (F)(1) and (G) of Part II of the exhibit to the settlement agreement also guarantee that in schools which do not otherwise satisfy the desegregation guidelines, there shall be a minimum black student enrollment of 25%, or 12.5% black and 12.5% other minority, in each elementary and junior high school, and a minimum enrollment of 250 black students in each senior high school. Thus, there will no longer exist any schools within the Milwaukee public school system which do not have a significant number of black students.

pliance with the agreement, and which, in addition to counsel for the parties to this action, shall have the sole right to apply to a United States Magistrate, to be designated by the Court, for judicial resolution of any problem arising under the settlement agreement, and the further right to appeal the Magistrate's decision to this Court. The Court has heard numerous complaints about the monitoring board: in particular, that the number of members is too small; that the members will not receive a salary; and that they have other full-time occupations which will preclude them from monitoring the defendants' compliance with the agreement in any meaningful way.

Despite those criticisms, the Court is satisfied that the monitoring board will constitute an adequate enforcement mechanism.[5] The initial five members have already been selected and are a distinguished group.[6] More important, the settlement agreement itself is intended as a final resolution of this action and an end to further litigation. The function of the monitoring board, as the Court perceives it, is therefore not to monitor the day-to-day administration of the school system or to supervise every action taken by the defendants, but rather to ensure that the total effect of defendants' actions with regard to such things as student racial balance, school sitings, and boundary changes is to further rather than to impede achievement of the goals set forth in the agreement. Significant as the role of the monitoring board is, the board is not intended to perform the duties previously performed by the Special Master, nor should there any longer be a need for such an office. The defendants, and the community, have had three years to work toward the goal of racial desegregation and to learn to function under court order. While not unmindful that complete racial desegre-

gation has not been achieved, the Court is satisfied that much has already been done to meet the goals set forth in the settlement agreement and that achievement of those goals is both feasible and likely. The Court is further satisfied that in view of the limited nature of its duties, the board, assisted by members of the plaintiff class who will bring to its attention actions which may not comport with the agreement, will have sufficient time to perform those duties satisfactorily and to protect the interests of the plaintiffs under the settlement agreement.

■ The agreement also provides for the payment of $550,000 to Lloyd A. Barbee, counsel for the named plaintiffs, for legal services rendered and $13,428.11 for costs and expenses, and for the payment of $300,000 to Irvin B. Charne, counsel for the unnamed plaintiffs, for legal services rendered and $29,350 for costs and expenses.

Section 1.47 of the *Manual* at 66–67 and 70 sets forth a list of factors to be considered by the Court in determining whether an award of attorneys' fees in a class action is reasonable. The *Manual* also provides at 65:

"The guiding principles in determining awards of attorneys' fees should be to provide compensation sufficient to stimulate the motive for representation of classes and to ensure that the fees awarded are consistent with the degree of benefits bestowed upon the class insofar as the bestowing of those benefits can be shown to be the product of the lawyer's work. * * * "

Since the initial liability decision was issued on January 19, 1976, Attorneys Barbee and Charne have filed numerous motions, briefs, and affidavits in support of their claim for attorneys' fees.[7] The Court itself, based on

---

5. Plaintiffs' counsel Attorney Lloyd Barbee has also assured the Court that he does not intend to treat this action as closed after the settlement agreement is approved. Part III of the exhibit to the agreement authorizes him to bring complaints before the Magistrate and from the Magistrate to this Court.

6. The initial members of the monitoring board are Lucille Biggerstaff, Ricardo Fernandez, Norman Gill, Harriett McCraney, and Wesley Scott.

7. See the briefs, motions, and affidavits filed January 23, 1976; February 17, 1976; August

its long exposure to this case, is well aware of their competence, of the time and labor spent by them, of the magnitude and complexity of this litigation, of the responsibility undertaken by them, of the work performed by them out of court in preparation for court proceedings, and of what they have achieved during this litigation. See *Manual* at 66–67.

Having carefully considered all of the factors set forth in the *Manual* and the materials submitted by plaintiffs' attorneys in support of their claim for attorneys' fees, the Court is satisfied that the amount offered them in settlement of their claim for legal services rendered is less than the Court would have awarded had it been required to decide the issue of fees, but not too small that it will discourage attorneys in the future from undertaking class representation in cases of public interest. Therefore, the Court finds that the portion of the settlement agreement which deals with compensation for plaintiffs' attorneys is fair, reasonable, and adequate under all of the circumstances of this case.

 In addition to reviewing the merits of the plaintiffs' case as compared to what is offered in settlement, the Court in deciding whether or not to accept the settlement should examine the reaction of class members to the settlement and the opinion of competent counsel with regard to the settlement, and should consider the possibility of collusion between counsel in arriving at the terms of the settlement.

First, the Court is persuaded that there was no collusion between counsel. The history of the litigation is a good indication in itself of lack of collusion. Two affidavits regarding the negotiation process have also been filed (see the affidavit of Irvin B. Charne filed March 23, 1979, and the affidavit of Lloyd A. Barbee, Irvin B. Charne, and Patrick W. Schmidt filed March 27, 1979), and the exhibit to the March 27, 1979, affi-

davit (attached hereto as Appendix D) is particularly persuasive. It sets forth the plaintiffs' original negotiating position, the defendants' original negotiating position, and the settlement terms, and demonstrates that in arriving at the settlement terms, both sides engaged in considerable compromise of their original positions. The testimony of Attorney Howard Pollack at the fairness hearing on March 26, 1979, about the negotiation process was also particularly informative, and is a sufficient foundation for a finding of lack of collusion.

Both of plaintiffs' counsel, Attorneys Charne and Barbee, and both of defendants' counsel, Attorneys Laurence C. Hammond and Patrick McDonnell of the City Attorney's office, have expressed themselves in favor of the settlement agreement. It is their opinion that the settlement agreement does provide for a systemwide remedy, that it will have positive integrative effects through July 1, 1984, that the goals set forth in the agreement can be achieved by efforts of the defendants under the supervision of plaintiffs' counsel and the monitoring board, and that in view of the developing state of the law in the area of school desegregation and the grant of certiorari by the Supreme Court in the Dayton and Columbus cases, see *Brinkman v. Gilligan*, 583 F.2d 243 (6th Cir. 1978), cert. granted sub nom. *Dayton Board of Education v. Brinkman*, —— U.S. ——, ——, 99 S.Ct. 831, 59 L.Ed.2d 31 (1979); *Penick v. Columbus Board of Education*, 583 F.2d 787 (6th Cir. 1978), cert. granted, —— U.S. ——, ——, 99 S.Ct. 831, 59 L.Ed.2d 31 (1979), the settlement will certainly preclude further delay in the implementation of a remedy and will spare the plaintiffs the real risk of ultimately achieving a far less encompassing remedy than the settlement provides. As stated in the plaintiffs' brief in support of the motion for approval of the settlement agreement filed March 22, 1979, at 8:

6, 1976; September 28, 1976; September 30, 1976; October 26, 1976; November 2, 1976; November 23, 1976; November 24, 1976; December 28, 1976; January 10, 1977; January 27, 1977; March 2, 1977; March 11, 1977; March 14, 1977; March 21, 1977; March 25,

1977; April 12, 1977; April 29, 1977; May 2, 1977; May 13, 1977; May 25, 1977; July 22, 1977; August 5, 1977; August 19, 1977; August 26, 1977; October 12, 1977; October 14, 1977; June 30, 1978; March 22, 1979; and March 23, 1979.

"There is thus no assurance that decisions on which this court relied will not be either reversed or remanded and that a stricter standard of proof will not be required of plaintiffs in school desegregation cases. An adverse decision in either *Dayton* or *Columbus* could necessitate a reexamination of this court's previous decisions. A reexamination of this case would no doubt delay implementation of a final remedy. More important, reexamination under a more stringent standard of proof creates the very real risk that the remedy that the court would order would be substantially less encompassing than that contained in the settlement agreement."

Attorney Barbee also expressed the opinion that given the geographic restrictions imposed on implementation of a remedy for the constitutional violations found by the Court in this case and declining white enrollment in the Milwaukee public school system which precludes 100% desegregation (see footnote 2), the settlement, even though not entirely satisfactory from the point of view of a person favoring total integration within the school system, is a realistic compromise in view of the type of remedy which the law even at present allows in the area of school desegregation.

The Court has a high opinion of all counsel who have participated in this litigation. Their judgment as to the merits of the settlement agreement therefore weighs heavily with the Court, particularly since the Court is convinced that agreement was not reached easily but rather was the result of long and difficult negotiations. Also, the judgment of counsel is in accord with the Court's view of the benefits that the agreement offers when it is compared to the strength of the plaintiffs' case on the merits. The Court also is persuaded that little more could be achieved through further litigation than is offered in the settlement, and that the settlement is a realistic compromise in view of the status of the law in general and this litigation in particular, the harm that could result and the expense and delay that would result from further litigation, and the presently existing limitations on the Court's power to impose an effective remedy. Therefore, the Court finds that the opinion of competent counsel in regard to the settlement agreement is a factor which weighs in favor of approval of that agreement.

Finally, the Court must consider the reaction of members of the plaintiff class to the settlement agreement. Forty-five persons appeared at the fairness hearing and made oral statements about the settlement agreement, and numerous others sent letters to the Court about the agreement. The majority of those persons were opposed to acceptance of the agreement, some on the ground that it goes too far in the direction of integration and others because it does not go far enough.

The opinions expressed were for the most part thoughtful and informative. They represent the opinion of only a small percentage of the class members, however, and most were somewhat misinformed with respect to the present state of the law in school desegregation cases and in particular to the extent of the power which the court exercises in the case of a settlement and as to the probable effect of the settlement agreement. On the effect of the settlement, the Court also had difficulties with the formula on student desegregation, and not until Dr. Long testified on March 29, 1979, did the Court understand that the probable consequences of the agreement will be more integrative than some, for example the amici curiae, had predicted. As stated previously, the Court can only accept or reject the settlement agreement; it cannot modify the agreement and still require the parties to accept it. *In Re General Motors Corporation Engine Interchange Litigation*, 594 F.2d 1106 at 1125, n. 24 (7th Cir. 1979). Also, the Court's duty in reviewing a settlement agreement is not to conduct a trial on the merits but rather to consider whether or not the agreement is fair, adequate, and reasonable, even though the plaintiffs might have obtained more relief had they chosen to continue litigating rather than to settle. *In Re General Mo-*

*tors,* supra, at 1132, n. 44; *Patterson v. Stovall,* 528 F.2d 108, 112 (7th Cir. 1976); *McDonald v. Chicago Milwaukee Corporation,* 565 F.2d 416 (7th Cir. 1977).

After reviewing the proposed settlement agreement in light of all of the factors which should be considered, see *Manual for Complex Litigation* § 1.46 at 56 (1977 ed.) (Wright & Miller); 3B Moore's *Federal Practice* ¶ 23.80[4] at 23–521 (2d ed. 1978), including the criticisms of certain class members, the Court is persuaded that the agreement is fair, reasonable, and adequate, and that it merits approval by the Court.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## IV. *Order*

For the foregoing reasons,

IT IS ORDERED that the motion of the plaintiffs and defendants for approval of the settlement agreement filed with the Court on March 1, 1979, is granted and the agreement is approved.

IT IS FURTHER ORDERED that United States Magistrate Ruth W. LaFave is appointed under Part III of the exhibit to the settlement agreement to monitor the defendants' compliance with the agreement.

IT IS FURTHER ORDERED that plaintiffs' and defendants' counsel shall within seven days from the filing date of this order prepare and file a proposed form of judgment. The primary burden of preparation shall lie with plaintiffs' counsel, and in the event that counsel cannot agree on a proposed form of judgment, plaintiffs' counsel shall within seven days from the filing date of this order file a proposed form of judgment and defendants' counsel may have five days thereafter to file comments on the plaintiffs' proposed form of judgment or an alternative proposed form of judgment.

## APPENDIX A

## SETTLEMENT AGREEMENT

## INTRODUCTION

This is a Settlement Agreement (hereafter referred to as "Agreement") whereby the parties to this Agreement settle all aspects of this class action, except those relating to the desegregation of faculties, subject to approval of the Court. Notice of this settlement shall be directed to all members of the class pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

This Agreement is entered into for (1) the named plaintiffs by their counsel, Lloyd A. Barbee, of Barbee and Goldberg, 152 West Wisconsin Avenue, Milwaukee, Wisconsin 53203, (2) the absent members of the plaintiff classes by their court-appointed attorney, Irvin B. Charne, of Charne, Glassner, Tehan, Clancy & Taitelman S.C., 211 West Wisconsin Avenue, Milwaukee, Wisconsin 53203 and (3) the Defendants, the Board of School Directors of the City of Milwaukee ("Board"), the individual members of the Board, the Superintendent of Schools, and the Secretary-Business Manager, by their counsel, L. C. Hammond, of Quarles & Brady, 780 North Water Street, Milwaukee, Wisconsin 53202, and James B. Brennan, City Attorney, by Patrick B. McDonnell, Principal Assistant City Attorney, 800 City Hall, Milwaukee, Wisconsin 53202.

## HISTORY OF THIS CASE

This action was commenced in 1965 as a class action on behalf of all present and future school children in the Milwaukee Public School System. A 30-day trial was held in 1973 and 1974, and on January 19, 1976, the Court rendered a decision finding that the Milwaukee Public School System was unconstitutionally segregated and ordering that a desegregation plan be developed. Shortly following this decision, the Milwaukee Teachers' Education Association was allowed to intervene as a party and participate in matters relating to remedy insofar as they affect teachers. On March 17, 1977, the Court approved a final desegregation plan and ordered the defendants to implement that plan through December 31, 1980.

The defendants took separate appeals of the Court's January 19, 1976 and March 17, 1977 orders. The United States Court of

Appeals for the Seventh Circuit affirmed the January 19, 1977 order, but the United States Supreme Court, on January 29, 1977, vacated the decision of the Court of Appeals and remanded the case to the Court of Appeals for reconsideration in light of two intervening Supreme Court decisions. On September 1, 1977, the Court of Appeals vacated this Court's January 19, 1976 and March 17, 1977 orders and remanded the case to this Court for further proceedings on the issues of whether or not the defendants had administered the Milwaukee Public School System with an intent to segregate and what present effects, if any, resulted from any intentionally segregative conduct found by the Court. The Court of Appeals and this Court ordered that a portion of the desegregation plan contained in this Court's March 17, 1977 order stay in effect for the 1977–78 school year.

The Court held an evidentiary hearing during January and February, 1978, on the issue of whether or not the defendants had engaged in intentional segregation. On June 1, 1978, the Court issued a decision finding that the defendants had administered the school system with segregative intent at least since 1950 and in doing so violated the rights of the plaintiffs under the United States Constitution.

On August 2, 1978, as a consequence of a request by defendants for additional time to prepare for the hearings on present effects, the Court ordered that an interim desegregation plan be implemented during the 1978–79 school year.

In July and October, 1978, the Court held an evidentiary hearing on the issue of what present effects resulted from the intentionally segregative acts found by the Court. On February 8, 1979, the Court issued a decision holding that the present effects were systemwide and directed the parties to submit proposed desegregation plans designed to remedy those present effects.

This Agreement is submitted in lieu of separate submissions of desegregation plans by the plaintiffs and defendants on all issues other than the teacher desegregation remedy to be ordered in this case.

## REASONS FOR SETTLEMENT OF THIS CLASS ACTION

Plaintiffs and some Board members believe that the Court's June 1, 1978 and February 8, 1979 Decisions are valid. Some members of the Board disagree and believe that (1) there were no actions engaged in by the Board which were taken with the intent to discriminate, (2) there were no present effects even if the violation findings were to withstand appellate scrutiny, (3) the legal premises applied by the Court are invalid and (4) these decisions would be reversed if appealed to higher courts. Nevertheless, the respective parties to this Agreement believe that settlement of this class action is desirable because (1) a majority of the Board believes that a continuation of the litigation would be distracting and the Board's primary attention should be focused upon educational concerns, (2) defendants have already implemented over two and one-half years of a court-ordered desegregation program, (3) the Board advocates a desegregation program which is primarily premised upon principles of voluntarism and concepts previously developed and announced by the Board in its (a) Statement on Education and Human Rights and (b) Options for Learning and Schools for the Transition announcements and (4) plaintiffs and the majority of the Board recognize that settlement will terminate this action, without adversary hearings on remedy and further appeals. It is believed that the best interests of the parties and the children attending the Milwaukee Public Schools will be served by the termination of this litigation and by the establishment of a spirit of trust and cooperation.

## TERMS OF THE SETTLEMENT

The parties to this Agreement stipulate and agree, subject to the Court's approval, that all aspects of this action, except those relating to the desegregation of faculties, may be settled upon the terms of the attached Exhibit and an order in conformity therewith may be entered by the Court. As

a part of this Agreement, the parties to it further agree not to appeal from any of the findings of fact, or conclusions of law contained in the Court's June 1, 1978 or February 8, 1979 Decisions or from the Orders entered on those dates. This Agreement is null and void if the Court declines to adopt the terms set forth in the Exhibit.

### NOTICE COSTS

The parties to this Agreement further stipulate and agree that the costs of providing the notice to class members ordered by the Court will be borne by defendants.

### EXHIBIT TO SETTLEMENT AGREEMENT

### I. INJUNCTION

Defendants, the Board of School Directors of the City of Milwaukee ("Board"), the members of that Board, Thomas Brennan, Anthony S. Busalacchi, Margaret Dinges, Gerard P. Farley, Stephen Jesmok, Jr., James F. Koneazny, Marian McEvilly, Maurice J. McSweeney, Edward S. Michalski, Lawrence J. O'Neil, Evelyn T. Pfeiffer, Lorraine M. Radtke, Lois Riley, Doris Stacy and Leon W. Todd, Jr., the Superintendent of Schools for the City of Milwaukee, Lee R. McMurrin, the Secretary-Business Manager of the Board, Thomas A. Linton, and their successors, officers and agents are hereby permanently enjoined from discriminating upon the basis of race in the operation of the public schools of the City of Milwaukee with respect to any matter which was the subject of this litigation.

### II. STUDENT DESEGREGATION

(A) Any student desiring to attend a "desegregated" school as defined in II(D) shall have the right to do so, and defendants shall annually advise all students in writing of this right.

(B) Defendants shall continue to implement the student transfer policies and procedures now in effect, the terms of which are contained in the Appendix attached hereto.

(C) Defendants shall, during the pendency of this order, assign students in good faith with the goal of having at least the following number of students enrolled in schools within the Milwaukee Public School System ("system") which are desegregated as defined in paragraph (D) below: (1) When the system percentage of blacks is 50% or less, three-fourths of the "base number" of students or (2) When the system percentage of blacks is more than 50%, three-fourths of the "base number" of students times a fraction consisting of the number of non-black students over the number of black students.

(D) A "desegregated" school for purposes of student desegregation is defined as:

(1) Each elementary or junior high school which has a student population composed of not less than 25% and not more than 60% black students and

(2) Each senior high school which has a student population composed of not less than 20% and not more than 60% black students.

(E) The "base number" upon which to compute the number of students to be in desegregated schools each year will be all students in the system with the exception of:

(1) Kindergarten and pre-kindergarten students,

(2) Exceptional education students attending schools devoted exclusively to exceptional education, and

(3) Those students enrolled in Vieau, Allen-Field, Kagel and Kosciuszko, as long as these schools have a bilingual education program.

(F) Each elementary and junior high school (except those specified in paragraphs II(E)(2) and (3)) will have either:

(1) A minimum black student enrollment of 25% or

(2) Where the school has a bilingual education program, a minimum com-

bined minority enrollment (as defined by the United States Department of Health, Education and Welfare) of 25% with at least 12.5% black students and at least 12.5% other minority students.

(G) All senior high schools which do not meet the requirements of Paragraph II(D)(2) will have a minimum of 250 black students.

(H) Nothing in this order prevents defendants from having more students than the number specified in II(C) attending desegregated schools.

(J) Defendants shall develop and implement a human relations program for students, the objectives of which shall be to aid the achievement of quality education and successful desegregation and integration, and the details of which shall be within the sole discretion of defendants. This program shall be implemented in each school year during which this order remains in effect.

## III. DESEGREGATION MONITORING

(A) United States Magistrate John C. McBride or such other U.S. Magistrate for the Eastern District of Wisconsin designated by the Court, is hereby appointed to monitor the defendants' compliance with this order. The Magistrate, on his own initiative, shall have the right to visit any school in the Milwaukee Public School System and to request and obtain information from defendants.

(B) In order to assist the Magistrate in monitoring the schools, a five member panel, hereinafter designated the "monitoring board," shall be established. The monitoring board shall be created according to and shall exercise the duties set forth in the following provisions:

(1) The monitoring board shall consist of five individuals who shall initially be selected by mutual agreement between counsel for plaintiffs and defendants. In the event any position on the monitoring board becomes vacant, a replacement member for that position shall be selected in the same manner. In the event counsel for plaintiffs and defendants cannot agree on a replacement member within two weeks after a vacancy occurs, the monitoring board shall select a replacement member.

(2) The monitoring board shall have jurisdiction over complaints made by individual members of the plaintiff classes regarding whether or not this order is being complied with. These complaints must be initiated by the affected class member or members who have direct knowledge of the veracity of the complaint and who have been adversely affected. Properly filed complaints must be in writing and submitted on forms approved and supplied by the monitoring board. The affected class member or members may be assisted in the complaint procedure by a parent, legal guardian, attorney or community group. To aid it in performing its duties, or in making its determinations relative to properly filed complaints, the monitoring board shall have the right, on reasonable notice to the Superintendent of Schools to visit any school in the Milwaukee Public School System. The monitoring board shall also have the right to request from defendants and to obtain within a reasonable time after such request is received, such information as is reasonably calculated to enable the monitoring board to make a determination relative to any properly filed complaint, or to permit it to to perform its duties.

(3) All complaints shall be addressed to and filed with the monitoring board which shall immediately forward a copy to the Superintendent

of Schools, who individually or through his designee, shall respond to such complaints in the first instance, prior to any investigatory action thereon by the monitoring board. However, the monitoring board may act in accordance with its jurisdiction under III(B)(2) prior to any response from the Superintendent or his designee, if time is of the essence. The response of the Superintendent shall be reviewed by the monitoring board, and if the monitoring board is satisfied with the Superintendent's response, the matter shall be considered resolved. In the event the monitoring board is not satisfied with the Superintendent's response, the monitoring board shall invite the complaining party to a review session with the Superintendent or his designee, at which session an attempt amicably to resolve the complaint shall be attempted. In the event the monitoring board remains dissatisfied with the Superintendent's response after the review session, the monitoring board may recommend a disposition of the matter to the Magistrate for the Magistrate's review and determination. If the monitoring board is satisfied with the Superintendent's response after the review session, the matter shall be deemed concluded.

(4) Defendants shall provide secretarial services to the monitoring board, which services shall primarily include coordinating the receipt and transmittal of complaints, notification of appropriate persons of scheduled meetings and functions, and provision of other similar secretarial services. There shall be no monetary compensation for members of the monitoring board, except for reimbursements for reasonable expenses which shall be provided by defendants. The monitoring board may not delegate any of its duties to outside groups or individuals.

(C) Plaintiffs' counsel have the right on reasonable notice to the Superintendent and the Secretary-Business Manager, with a copy to defendants' counsel, to visit any school · in the Milwaukee Public School System to determine whether or not this order is being complied with and implemented in a nondiscriminatory manner. Plaintiffs' counsel shall also have the right to request from defendants, with a copy to defendants' counsel, and to obtain within a reasonable time after such request is received by the Superintendent and Secretary-Business Manager, such information as is reasonably calculated to enable the requesting counsel to determine whether or not this order is being complied with and implemented in a nondiscriminatory manner.

(D) On October 15, 1979, and on March 15, 1980 (or on the first business day thereafter if these days fall on the weekend), and on the same dates in each school year during which the order remains in effect, defendants shall file with the Magistrate, the monitoring board, and all counsel a report listing, by numbers and percent, the racial composition of the teaching staff and of the student body in each school of the Milwaukee Public School System, excluding from such reports kindergarten students and students in schools devoted exclusively to exceptional education. Each report shall also contain a certification, to the best of the knowledge of the person so certifying, that the order is being complied with and implemented in a nondiscriminatory manner. Either the Superintendent or the Secretary-Business Manager of the Board of School Directors of the City of Milwaukee, whoever is appropriate,

shall certify such report. In addition, on November 15, 1979, and on the same day in each school year during which the court order remains in effect, defendants shall file with the Magistrate, the monitoring board, and all counsel a report listing the racial composition of all classes in each school in the Milwaukee Public School System which has been counted in determining whether or not the goals have been achieved, indicating in such reports which classes are exempted under the court order.

(E) In the event counsel or the monitoring board determines that judicial resolution of any problem which they perceive to exist is necessary, they shall apply to the Magistrate for relief, and he is empowered to review and resolve any problems which counsel or the monitoring board deem necessary for review and resolution. At the request of any party, the monitoring board or the Magistrate, the proceeding before the Magistrate shall be on the record. If the dispute results in a formal hearing, the Magistrate shall render a written decision on the matter brought before him, and any party shall have the right to appeal to the Court on the record made before the Magistrate.

## IV. SCHOOL OPENINGS AND CLOSINGS AND THE LOCATIONS OF SPECIALTY PROGRAMS

Future decisions by defendants with respect to school openings, school closings, and the locations of school specialty programs will not be determined in a racially discriminatory manner.

## V. DURATION

The requirements set forth herein shall apply from the 1979–80 school year to the 1983–84 school year, inclusive. If defendants have complied with the requirements of this order, on July 1, 1984 this order shall lapse and be of no further force and effect and this action shall be dismissed with prejudice.

## VI. FEES AND COSTS

(A) Defendants shall pay Lloyd A. Barbee, counsel for the named plaintiffs, $550,000.00, for legal services rendered in connection with this case. He further shall be reimbursed in the amount of $13,428.11 for costs and expenses. This total sum of $563,428.11 shall be paid in the following manner:

(1) $113,428.11 shall be paid as soon as practicable after the date of this order, but not later than May 31, 1979.

(2) $90,000.00 shall be paid on or before July 1 of the years 1980, 1981, 1982, 1983 and 1984.

These payments shall constitute a full and complete payment for all legal services performed and costs and expenses incurred by Attorney Barbee through the date of this order.

(B) Defendants shall pay Irvin B. Charne, counsel for the absent members of the plaintiff classes, $300,000.00, for legal services rendered in connection with this case. He further shall be reimbursed in the amount of $29,350.00 for costs and expenses. This total sum of $329,350.00 shall be paid as soon as practicable after the date of this order, but not later than May 31, 1979. This payment shall constitute a full and complete payment for all legal services performed and costs and expenses incurred by Attorney Charne through the date of this order.

(C) All costs previously entered or fees previously imposed in this action

against either defendants or plaintiffs shall be deemed paid and any outstanding judgment for the same shall be deemed satisfied.

## VII. DISMISSAL OF COUNSEL FOR UNNAMED PLAINTIFFS

Because the need no longer exists for separate counsel for the absent members of the plaintiff classes to continue in the capacity for which he was appointed, Irvin B. Charne is hereby relieved from all aspects of his appointment except those relating to the determination of a remedy for faculty desegregation. Irvin B. Charne shall continue to act as counsel for the plaintiff classes in matters relating to litigation concerning the determination of a faculty desegregation remedy, at no cost to defendants. When the order concerning faculty desegregation becomes final, Irvin B. Charne shall be relieved from all aspects of his appointment. To the extent Irvin B. Charne is relieved from his appointment, Lloyd A. Barbee shall henceforth represent the plaintiff classes.

## VIII. FINAL ORDER

This order constitutes a final order directing the defendants to implement a plan for the desegregation of the Milwaukee Public School System. This Court is aware of the Emergency School Aid Act, 20 U.S.C. Section 1601, et seq., and it has issued this order with an awareness of the requirements for receiving such federal aids.

## APPENDIX REGARDING PUPIL TRANSFER POLICY

The parents or legal guardians of a pupil who is enrolled in the Milwaukee Public Schools, or the pupil if 18 or older, may request a transfer from a school in the district in which the pupil resides to another school in the city, subject to the provisions listed below.

(A) *Basic Conditions*

A transfer permit may be granted by the Superintendent's office under the following conditions:

(1) That the parents, or pupil if older, assume(s) the responsibility for requesting a transfer by securing the appropriate form from a school or the Pupil Personnel office at the School Administration Building.

(2) That the parents, or pupil if 18 or older, submit(s) the request for a transfer during the period set for the respective school year within which they wish to have the transfer take effect.

(3) That transfer permits be granted where space is available at the appropriate grade level, according to the following guidelines:

(a) That first priority in enrollment shall be reserved to all pupils who reside in the district and wish to attend their attendance school, when such attendance can be accommodated within racial balance requirements.

(b) A student may transfer from one school to another where space is available and the transfer would contribute to the racial balance in the receiving school.

(4) That the parents accept full responsibility for the child's regular and punctual attendance and acceptable conduct in school.

(5) That transportation will be provided pursuant to the Board Adopted Transportation Policy.

(6) That a random selection or lottery system be utilized when transfer applications for a given school exceed the number of spaces available at that school.

(B) *Change of Residence*

The guidelines for pupil attendance will be used to determine the school of attendance following a change of the parents' (or pupil if age 18 or older) legal residence within the city.

(C) *Administrative Transfers*

The Superintendent of Schools may, for good and sufficient reason, make an administrative transfer or pupil assignment at any time.

(D) *Duration of Transfers*

Once a transfer permit has been issued by the Superintendent's office, it remains in effect without renewal unless a change of residence occurs or the permit is revoked. Pupils granted transfer permits beginning with the 1976–1977 school year will have the option of continuing in the feeder pattern of the schools they are attending within racial balance requirements. Once on transfer, a request to return to the school in the attendance area of residence must be processed under the procedures included in this pupil transfer policy.

(E) *Conferences with Parents*

Principals and other appropriate school personnel will provide all necessary and pertinent information required by a parent who is interested in taking advantage of the pupil transfer policy. No parent is to be discouraged from applying for a transfer permit.

(F) *Appeals*

An Administrative Committee, to be appointed by the Superintendent, will consider all cases where a parent, or pupil age 18 or older, might wish to appeal a school assignment. The Administrative Committee would also make recommendations to the Superintendent concerning the revocation of transfer permits and the granting of transfers under unusual health, safety, or educational needs conditions. Membership of the committee would be representative of the ethnic and racial make-up of the Milwaukee Public Schools. All decisions by the Administrative Committee are to be governed by the Statement on Education and Human Rights adopted by the Board of School Directors on September 2, 1975. Documentation of each transfer granted under these conditions would be on file for public or court inspection.

(G) *Transportation Service*

Transportation service will be provided in accordance with the levels of service contained in the Board Adopted Transportation Policy.

## APPENDIX B

# NOTICE TO CLASS MEMBERS OF THE PROPOSED SETTLEMENT OF THE MILWAUKEE PUBLIC SCHOOL DESEGREGATION CASE AND OF THE HEARING ON THAT SETTLEMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

KEVIN ARMSTRONG and KRAIG ARMSTRONG,
minors, by Roosevelt Savage and
Rochelle Savage, their parents and
next friends;

MARY LOU HICKS and PRESTEN HICKS,
minors, by Paul L. Hicks and Rose B.
Hicks, their parents and next friends;

JEAN ROBINSON, by Alonzo Robinson and
Theresa Robinson, her parents and
next friends; and

ANDREW SMITH, GRANTLEY H. SMITH,
and KERMIT SMITH, minors, by Kenneth
L. Smith and Phyllis G. Smith, their
parents and next friends;

 Plaintiffs,

v. C. A. No. 65-C-173

BOARD OF SCHOOL DIRECTORS OF
THE CITY OF MILWAUKEE;

THOMAS BRENNAN, ANTHONY S. BUSALACCHI,
MARGARET DINGES, GERARD P. FARLEY,
STEPHEN JESMOK, JR., JAMES F. KONEAZNY,
MARIAN McEVILLY, MAURICE J. McSWEENEY,
EDWARD S. MICHALSKI, LAWRENCE J. O'NEIL,
EVELYN T. PFEIFFER, LORRAINE M. RADTKE,
LOIS RILEY, DORIS STACY, and LEON W.
TODD, JR., Members of the Board of
School Directors of the City of Milwaukee;

LEE R. McMURRIN, Superintendent of Schools
of the City of Milwaukee; and

THOMAS A. LINTON, Secretary-Business
Manager of the Board of School Directors
of the City of Milwaukee;

 Defendants,

MILWAUKEE TEACHERS' EDUCATION ASSOCIATION,

Undesignated Intervenor.

NOTICE TO CLASS MEMBERS OF THE PROPOSED SETTLE-
MENT OF THE MILWAUKEE PUBLIC SCHOOL DESEGREGATION
CASE AND OF THE HEARING ON THAT SETTLEMENT

NON PROFIT ORG.
U S. POSTAGE
PAID
MILWAUKEE, WI
PERMIT NO. 3240

IMPORTANT LEGAL NOTICE

TO: ALL STUDENTS PRESENTLY ENROLLED OR WHO WILL ENROLL IN THE MILWAUKEE PUBLIC SCHOOL SYSTEM, THEIR PARENTS AND THEIR GUARDIANS:

You are hereby notified pursuant to Rule 23(e) of the Federal Rules of Civil Procedure that a hearing will be held on March 26, 1979, at 9:30 A.M. before the Honorable John W. Reynolds, Chief Judge of the United States District Court for the Eastern District of Wisconsin, at the United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, in his Courtroom, Room 425, pursuant to an order of the Court dated March 6, 1979.

The purpose of the hearing is to determine whether a proposed settlement of this action, commonly known as the Milwaukee Public School Desegregation Case, should be approved by this Court as fair, reasonable and adequate. If the settlement is approved by the Court, the members of the plaintiff classes, including yourself, will be bound by the settlement, subject to the right of appeal.

At a hearing on March 5, 1979, the Court found that the settlement proposal is within the range of possible approval and that there is probable cause to submit it to members of the class and to hold a hearing on its fairness at which all interested parties will have an opportunity to be heard. The Court also found that this notice is fair and adequate.

## HISTORY OF THIS CASE

This action was commenced in 1965 as a class action on behalf of all present and future school children in the Milwaukee Public School System. A 30-day trial was held in 1973 and 1974, and on January 19, 1976, the Court rendered a decision finding that the Milwaukee Public School System was unconstitutionally segregated and ordering that a desegregation plan be developed. Shortly following this decision, the Milwaukee Teachers' Education Association ("MTEA") was allowed to intervene as a party and participate in matters relating to remedy insofar as they affect teachers. On March 17, 1977, the Court approved a final desegregation plan and ordered the defendants to implement that plan through December 31, 1980.

The defendants took separate appeals of the Court's January 19, 1976 and March 17, 1977 orders. The United States Court of Appeals for the Seventh Circuit affirmed the January 19, 1977 order, but the United States Supreme Court, on January 29, 1977, vacated the decision of the Court of Appeals and remanded the case to the Court of Appeals for reconsideration in light of two intervening Supreme Court decisions. On September 1, 1977, the Court of Appeals vacated this Court's January 19, 1976 and March 17, 1977 orders and remanded the case to this Court for further proceedings on the issues of whether or not the defendants had administered the Milwaukee Public School System with an intent to segregate and what present effects, if any, resulted from any intentionally segregative conduct found by the Court. The Court of Appeals and this Court ordered that a portion of the desegregation plan contained in this Court's March 17, 1977 order stay in effect for the 1977-78 school year.

The Court held an evidentiary hearing during January and February, 1978, on the issue of whether or not the defendants had engaged in intentional segregation. On June 1, 1978, the Court issued a decision finding that the defendants had administered the school system with segregative intent at least since 1950 and in doing so violated the rights of the plaintiffs under the United States Constitution.

On August 2, 1978, as a consequence of a request by defendants for additional time to prepare for the hearings on present effects, the Court ordered that an interim desegregation plan be implemented during the 1978-79 school year.

In July and October, 1978, the Court held an evidentiary hearing on the issue of what present effects resulted from the intentionally segregative acts found by the Court. On February 8, 1979, the Court issued a decision holding that the present effects were systemwide and directed the parties to submit proposed desegregation plans designed to remedy those present effects.

On March 1, 1979, in lieu of separate submissions of desegregation plans by the plaintiffs and defendants, a Settlement Agreement dealing with all issues other than the teacher desegregation remedy was submitted to the Court. It is this Settlement Agreement which prompted this notice to class members.

## REASONS FOR SETTLEMENT OF THIS CLASS ACTION

Plaintiffs and some members of the Board of School Directors of the City of Milwaukee ("Board") believe that the Court's June 1, 1978 and February 8, 1979 Decisions are valid. Some members of the Board disagree and believe that (1) there were no actions engaged in by the Board which were taken with the intent to discriminate, (2) there were no present effects even if the violation findings were to withstand appellate scrutiny, (3) the legal premises applied by the Court are invalid and (4) these decisions would be reversed if appealed to higher courts. Nevertheless, the respective parties to this Agreement believe that settlement of this class action is desirable because (1) a majority of the Board believes that a continuation of the litigation would be distracting and the Board's primary attention should be focused upon educational concerns, (2) defendants have already implemented over two and one-half years of a court-ordered desegregation program, (3) the Board advocates a desegregation program which is primarily premised upon principles of voluntarism and concepts previously developed and announced by the Board in its (a) Statement on Education and Human Rights and (b) Options for Learning and Schools for the Transition announcements and (4) plaintiffs and the majority of the Board recognize that settlement will terminate this action, without adversary hearings on remedy and further appeals. It is believed that the best interests of the parties and the children attending the Milwaukee Public Schools will be served by the termination of this litigation and by the establishment of a spirit of trust and cooperation.

## TERMS OF THE SETTLEMENT AGREEMENT

The Settlement Agreement negotiated by the plaintiffs and defendants provides for the entry of an order by the Court covering all aspects of this action except those relating to the desegregation of faculties. The faculty desegregation remedy will be determined by the Court. The Agreement further provides that no appeals will be taken by the parties to the Agreement (although parties who appear and object to the Agreement in the manner set forth below will retain their right to appeal in the event the Court

approves the Agreement). A summary of the operative terms of the order is attached as an Exhibit to this notice. This order will, if approved by the Court and if you do not appear and object to the Agreement in the manner set forth below, be your sole remedy for the constitutional violations found in this Court's previous decisions and orders. Please study the exhibit carefully. It may affect your rights.

## FACULTY DESEGREGATION GOALS

The plaintiffs and defendants have jointly submitted a plan for faculty desegregation which differs from that submitted by the MTEA. All parties, including the MTEA, are in substantial agreement that any plan which might be approved by the Court would have at least the following as goals for the desegregation of faculties:

A. Definition of a desegregated faculty for fall, 1979:

1. At least two-thirds (2/3) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a plus ( + ) or minus (-) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

2. At least one-sixth (1/6) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a plus ( + ) or minus (-) ten (10) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

B. Definition of a desegregated faculty for fall, 1980, 1981, 1982, 1983:

1 At least two-thirds (2/3) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a plus ( + ) or minus (-) five (5) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

2. At least one-third (1/3) of the schools would meet the goal of desegregating the faculties when the faculties in those schools are within a plus ( + ) or minus (-) ten (10) percentage points of the percentage that the total number of black teachers is to the total number of teachers within the school system.

## THE HEARING

At the hearing at 9:30 A.M. on March 26, 1979, in Room 425 of the Federal Building, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, you may appear in person or by counsel and make an oral presentation setting forth why the proposed settlement either should or should not be approved by the Court as fair, reasonable and adequate. If you or your counsel wish to make an oral presentation at the hearing, you must, on or before March 22, 1979, file with the Clerk of this Court a written notice stating your intention to appear and stating the position you will advocate before the Court. As an alternative to making an oral presentation, you or your counsel may file with the Clerk of Court on or before March 22, 1979, a written statement setting forth why the proposed settlement either should or should not be approved by the Court as fair, reasonable and adequate. The written notice or any written statement must be taken to or mailed to:

Clerk of the Court
United States District Court
Eastern District of Wisconsin
Room 362 Federal Building
517 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

Do not write or call Judge Reynolds directly.

If you are satisfied with the settlement, you need do nothing. If you are not satisfied with it, you should follow the procedure set forth above.

If the Settlement Agreement is not approved by the Court, you will be bound by the outcome of future litigation in this case, regardless of whether that outcome is favorable or adverse to you.

## EXAMINATION OF PLEADINGS AND PAPERS

The foregoing references to the pleadings and orders in this case, as well as the terms of the Settlement Agreement as summarized in the Exhibit, are only summaries. The complete texts are on file with the Clerk of the Court, United States District Court for the Eastern District of Wisconsin, 517 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, under the file number set forth above and are available for inspection there.

Dated March 6, 1979, at Milwaukee, Wisconsin.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

By: /s/ Ruth W. LaFave
------------------------------------------
Ruth W. LaFave
Clerk of the Court

## EXHIBIT TO NOTICE TO CLASS MEMBERS OF THE PROPOSED SETTLEMENT OF THE MILWAUKEE PUBLIC SCHOOL DESEGREGATION CASE

The following is a summary of the operative terms of an order which may be entered by the Court if it approves the Settlement Agreement negotiated by the parties.

## I. INJUNCTIVE PROVISIONS

The Settlement Agreement contains an injunction which runs against the Board, its members, the Superintendent, the Secretary-Business Manager and all successors and agents. It prohibits discrimination upon the basis of race in the operation of the schools with respect to any matter which was the subject of the litigation.

## II. STUDENT DESEGREGATION

Any student desiring to attend a "desegregated" school shall have the right to do so, and defendants shall annually advise all students in writing of this right. A desegregated school for purposes of student desegregation is defined as:

(1) Each elementary or junior high school which has a student population composed of not less than 25% and not more than 60% black students and
(2) Each senior high school which has a student population composed of not less than 20% and not more than 60% black students.

While the order is pending, defendants shall assign students in good faith with the goal of having at least the following number of students enrolled in schools within the Milwaukee Public School System which are desegregated:

(1) When the system percentage of blacks is 50% or less, three-fourths of the "base number" of students or
(2) When the system percentage of blacks is more than 50%, three-fourths of the "base number" of students times a fraction consisting of the number of non-black students over the number of black students.

The "base number" used to compute the number of students to be in desegregated schools is all students in the system except:

(1) Kindergarten and pre-kindergarten students,
(2) Exceptional education students attending schools devoted exclusively to exceptional education, and
(3) Those students enrolled in Vieau, Allen-Field, Kagel and Kosciuszko, as long as these schools have a bilingual education program.

In addition, each elementary and junior high school (except those listed above) will have either:

(1) A minimum black student enrollment of 25% or
(2) Where the school has a bilingual education program, a minimum combined minority enrollment of 25% with at least 12.5% black students and at least 12.5% other minority students.

Additionally, all senior high schools which are not otherwise desegregated will have a minimum of 250 black students.

Nothing in the order prevents defendants from having more students attending desegregated schools than the number specified in the order.

The student transfer policies and programs now in effect will continue. These require that transfers contribute to the racial balance in the school to which the student seeks to transfer.

Finally, defendants will be ordered to develop and implement a human relations program for students, the objectives of which shall be to aid the achievement of quality education and successful desegregation and integration, and the details of which shall be within the sole discretion of defendants. This program shall be implemented in each school year during which the order remains in effect.

## III. DESEGREGATION MONITORING

Overall responsibility for monitoring compliance with the Court order which will be entered if the proposal is approved by the Court is vested in United States Magistrate John C. McBride. In addition, a five-member panel designated the "monitoring board" will have jurisdiction to review complaints filed by members of the plaintiff classes regarding whether or not the order is being complied with. Members of the monitoring board are to be selected by mutual agreement of the parties and shall serve as volunteers, without compensation.

Complaints must be initiated by the affected class member or members who have direct knowledge of the veracity of the complaint and who have been adversely affected. Assistance in the complaint procedure may be provided by a parent, legal guardian, attorney or community group.

The monitoring board shall have the right to visit schools and to obtain information from defendants which will enable the monitoring board to make a determination relative to any properly filed complaint or to permit it to perform its duties.

Once a complaint is received, defendants have the first opportunity to respond to it, but in the event this response is unsatisfactory to the monitoring board, it may resolve the matter. If either party is dissatisfied with the monitoring board's decision, an appeal may be taken to the Magistrate, and eventually to the Court if requested.

Secretarial services and reimbursement for reasonable expenses are to be provided to the monitoring board by defendants.

In addition, the monitoring procedure specifies certain reporting requirements with respect to the desegregation goals which have been established and provides a mechanism for information and documents to be obtained by counsel for the plaintiffs if necessary.

## IV. SCHOOL OPENINGS AND CLOSINGS AND THE LOCATIONS OF SPECIALTY PROGRAMS

Future decisions by defendants with respect to school openings, school closings and the locations of specialty school programs will not be determined in a racially discriminatory manner.

## V. DURATION

The Settlement Agreement specifies that the desegregation program shall remain in effect for five years. On July 1, 1984, if the requirements of the order have been complied with, the order lapses and is of no further force and effect and the action will then be dismissed with prejudice.

## VI. FEES AND COSTS

The Settlement Agreement provides for a payment to Irvin B. Charne, counsel for the absent members of the plaintiff classes, of $329,350.00, and to Lloyd A. Barbee, counsel for the named plaintiffs, of $563,428 11. These payments would cover all fees, costs and expenses through the date of the signing of the order. Mr. Charne's fees are to be paid before May 31, 1979, and Mr. Barbee's fees will be paid through an initial payment of $113,428.11 before May 31, 1979, and payments of $90,000.00 per year for five additional years.

## VII. DISMISSAL OF COUNSEL FOR UNNAMED PLAINTIFFS

The Settlement Agreement provides that Mr. Charne is relieved from his appointment as counsel except with respect to those matters relating to the determination of a remedy for faculty desegregation. To the extent Mr. Charne is relieved from his appointment, Mr. Barbee is to represent the plaintiff classes.

## VIII. FINAL ORDER

The order to be entered is a final order directing the defendants to implement a plan for the desegregation of the Milwaukee Public School System. The Court will issue the order with an awareness of the requirements set forth in the Emergency School Aid Act for receiving federal aids.

## APPENDIX C

### A FIVE–YEAR PROJECTION BASED ON THE THEORETICAL ASSUMPTION OF THE MINIMUM, THE MOST PROBABLE, AND THE MAXIMUM DESEGREGATION

| Year | | Projected Total Enrollment | Base Enrollment | Projected Black Enrollment | % Black in System | Projected Blacks in Desegregated Schools | % of Blacks in Desegregated Schools | Projected Nonblack Enrollment | Projected Nonblacks in Desegregated Schools | % of Nonblacks in Desegregated Schools | % of Total Students in Desegregated Schools | Minimum % Required in Desegregated Schools |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1979 | Min. | 92,000 | 80,337 | 37,044 | 46.1 | 21,378 | 57.71 | 43,293 | 38,875 | 89.79 | 75.0 | 75.0 |
| | Prob. | 92,000 | 80,337 | 37,044 | 46.1 | 24,964 | 67.4 | 43,293 | 38,874 | 89.8 | 79.0 | 75.0 |
| | Max. | 92,000 | 80,337 | 37,044 | 46.1 | 37,044 | 100.0 | 43,293 | 43,293 | 100.0 | 100.0 | 75.0 |
| 1980 | Min. | 87,630 | 76,823 | 38,668 | 48.15 | 19,462 | 50.33 | 38,155 | 38,155 | 100.0 | 75.0 | 75.0 |
| | Prob. | 87,630 | 76,823 | 38,668 | 48.15 | 26,482 | 68.5 | 38,155 | 36,091 | 94.6 | 81.5 | 75.0 |
| | Max. | 87,630 | 76,823 | 38,668 | 48.15 | 38,668 | 100.0 | 38,155 | 38,155 | 100.0 | 100.0 | 75.0 |
| 1981 | Min. | 83,467 | 72,886 | 38,427 | 50.73 | 18,615 | 48.44 | 34,460 | 34,460 | 100.0 | 72.8 | 72.8 |
| | Prob. | 83,467 | 72,886 | 38,427 | 50.73 | 25,673 | 66.8 | 34,460 | 32,460 | 94.2 | 79.8 | 72.8 |
| | Max. | 83,467 | 72,886 | 38,427 | 50.73 | 38,427 | 100.0 | 34,460 | 34,460 | 100.0 | 100.0 | 72.8 |
| 1982 | Min. | 79,502 | 69,424 | 38,393 | 53.31 | 14,581 | 37.97 | 31,081 | 31,031 | 100.0 | 65.7 | 65.7 |
| | Prob. | 79,502 | 69,424 | 38,393 | 53.31 | 25,106 | 65.4 | 31,081 | 29,094 | 93.8 | 78.1 | 65.7 |
| | Max. | 79,502 | 69,424 | 38,393 | 53.31 | 38,393 | 100.0 | 31,081 | 31,031 | 100.0 | 100.0 | 65.7 |
| 1983 | Min. | 75,726 | 66,127 | 38,276 | 55.89 | 11,289 | 29.49 | 27,851 | 27,851 | 100.0 | 59.2 | 59.2 |
| | Prob. | 75,726 | 66,127 | 38,276 | 55.89 | 24,311 | 63.5 | 27,851 | 25,976 | 93.3 | 76.0 | 59.2 |
| | Max. | 75,726 | 66,127 | 38,276 | 55.89 | 38,276 | 100.0 | 27,851 | 27,851 | 100.0 | 100.0 | 59.2 |

## APPENDIX D

### EXHIBIT A

SUMMARY OF SETTLEMENT NEGOTIATION

| Issue | Plaintiffs' Original Negotiating Position | Defendants' Original Negotiating Position | Settlement Terms |
|---|---|---|---|
| STUDENT DESEGREGATION | All students are to be in schools which are 25–50% black except for "X," with "X" being determined year-by-year by grade level by applying this formula: $$\frac{B-X}{T-X} = .4$$ If "X" is positive, it is the maximum number of black students who may be assigned to schools outside the range. If "X" is negative, it is the maximum number of white students who may be assigned to schools outside the range. | Status quo maintained. Two-thirds of the schools to be 25–50% black. | 75% of the students (excluding kindergarten, ex ed in exclusively ex ed schools and students in four bilingual schools) are to be in either high schools which are 20–60% black or elementary or junior high schools which are 25–60% black. Minimum black enrollments of 250 black students in high schools and either (1) 25% black or (2) 12.5% black and 12.5% other minorities and a bilingual program, in elementary and junior high schools, is required. |
| DURATION OF ORDER | 12 years | 3 years | 5 years |
| MONITORING | Nine-member monitoring board with very broad jurisdiction. Once a semester submission of statistics required. School visitation and data requesting authority. | No monitoring board required. Magistrate to review statistics for compliance once a year. | Five-member monitoring board with jurisdiction to review complaints relating to the order. Magistrate to review decisions if appealed by one of the parties. Once a semester submission of statistics required. Visitation and data requesting authority. |
| FEES | $825,000 + for Attorney Barbee plus costs and expenses. $340,000 + for Attorney Charne, plus costs and expenses. | Substantial downward adjustments required, because of duplication of efforts, loss of appeal, risk of further litigation, etc. | $550,000 plus costs and expenses for Attorney Barbee. $300,000 plus costs and expenses for Attorney Charne. |
| MISCELLANEOUS | Racial balance transfer plan shall stay in effect. | Racial balance transfer plan shall stay in effect. | Racial balance transfer plan shall stay in effect. |
| | Nondiscriminatory criteria are to be established for closings and locations of specialties. | No need to mention in order as covered by general injunction. | School openings and closings and locations of specialties will not be determined in a discriminatory manner. |
| | Prohibitory and mandatory injunction will be issued. | Prohibitory and mandatory injunction will be issued. | Prohibitory and mandatory injunction will be issued. |
| | All students have the right to attend desegregated schools. | All students have the right to attend desegregated schools. | All students have the right to attend desegregated schools. |