Chinyere JENKINS, et al., Plaintiffs,

v.

The STATE OF MISSOURI,
et al., Defendants.

No. 77–0420–CV–W–1.

United States District Court,
W.D. Missouri,
Western Division.

May 22, 1997.

Arthur A. Benson, II, Kansas City, MO, for plaintiffs.

Mark A. Thornhill, Spencer, Fane, Britt & Browne, Kansas City, MO, Taylor Fields, Charles R. Brown, Fields & Brown, Kansas City, MO, for defendant KCMOSD.

Missouri Attorney General's Office, Bart A. Matanic, Jefferson City, MO, for defendant State of MO.

Scott Raisher, Jolley, Walsh, Hurley, Raisher Schaeffer & Roher, Kansas City, MO, for American Federation of Teachers.

## ORDER

WHIPPLE, District Judge.

Pending before the Court is Plaintiffs' motion, pursuant to Federal Rule of Civil Procedure 62(c), to stay the Court's approval of the settlement agreement between the State of Missouri and the Kansas City, Missouri School District ("KCMSD") pending appeal.

### I. Factual and Procedural Background

On April 26, 1996, the State of Missouri filed a motion that requested a declaration of unitary status, dissolution of all injunctions, and relinquishment of jurisdiction from the Court's desegregation order. On May 21, 1996, the State and the KCMSD announced that they had entered into a settlement agreement which, if approved by the Court, would release the State from joint and several liability. The release would end the State's obligation to fund the desegregation remedy after the payment of $314 million over a three-year period. The American Federation of Teachers ("AFT"), an intervenor in this action, joined the agreement. On July 19, 1996, the State filed a motion requesting final dismissal of the case and approval of the agreement.

At the June 1996 budget hearing, the Court increased the State's funding obligations by $6 million, which escalated the State's total obligation to approximately $320 million. The State has already paid $69 million for Fiscal Year 1997, which leaves a net

amount due under the agreement of approximately $251 million. *See* Order of May 20, 1997 (correcting the numerical amounts that the State had paid and the net due). Consistent with the State's role throughout the remedial phase of this case, the agreement focuses only on funding. It is silent as to how the KCMSD must administer the funds to implement the desegregation remedy.

On August 14, 1996, the KCMSD filed a memorandum supporting approval of the agreement. The KCMSD opposed the state's motion for unitary status but agreed that the Court should release the State from any further obligations except those delineated in the agreement. The AFT took the same position as the KCMSD. Plaintiffs contested both the State's motion for unitary status and motion for approval of the agreement.

The Court held a three-week hearing to hear testimony relating to the above-mentioned motions. It also permitted the parties to file post-hearing briefs. On March 25, 1997, before transferring the case to this division, Judge Russell Clark approved the settlement agreement. Judge Clark summarized the consequences of the approval:

> [T]he Court feels that any remaining obligation of the State to the school children of Kansas City may be discharged by the payment of the funds provided for in the Agreement. Equity requires a modification of the earlier remedy prescribed by this Court ... The Court declares that the joint and several liability finding [between the State and the KCMSD] is therefore modified to individual liability of the KCMSD. The State's obligation shall end and the State will be entitled to an Order from this Court dismissing the State from this action when the State has paid the sums provided for in the Agreement.

Order of March 25, 1997 at 44. Although the Court approved the settlement agreement and released the State from joint and several liability, it granted the State's motion for unitary status only in part. *See* Order of March 25, 1997 at 12–37. The Court repeatedly noted that granting unitary status to the entire school district would result not only in the loss of state-supplied desegrega-tion funding, but also of the court-ordered portion of the tax levy. *See, e.g.,* Order of March 25, 1997 at 5–6, 31, 36–37. Subsequently, a host of motions were filed, including Plaintiffs' pending motion to stay the Court's approval of the settlement agreement pending appeal.

## II. Standard For Granting A Stay Under Rule 62(c)

When a party appeals a judgment that dissolves an injunction, Federal Rule of Civil Procedure 62(c) authorizes the district court to stay its own order of dissolution during the pendency of the appeal. *See* Fed. R.Civ.P. 62(c). Stays are commonly intended to preserve the status quo until the court of appeals can determine the validity of the district court's dissolution of the injunction. *See* 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2904 (2d ed. 1995). In this case, Plaintiffs invoke Rule 62(c) to stay the portion of the Court's Order of March 25, 1997 that approved the settlement agreement and modified the State's liability under the earlier desegregation order. Essentially, the Order's release and approval of the settlement was a partial dissolution of the structural injunction over the administration of the school district, making Rule 62(c) applicable.

The factors to be considered in granting a stay pending judicial review under Rule 62 are essentially those factors considered in *Dataphase Sys., Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir.1981) for granting preliminary injunctive relief. *Packard Elevator v. I.C.C.,* 782 F.2d 112, 114 (8th Cir.1986). The Eighth Circuit has adopted both a traditional test and an alternative test for evaluating requests under Rule 62(c). *See Dataphase Sys.,* 640 F.2d at 112. The traditional test requires the moving party to demonstrate the following factors: (1) a substantial probability of success on the merits of the appeal; (2) a showing that the failure to grant a stay would cause irreparable injury; (3) a showing that no substantial harm will come to other interested parties; and (4) a showing that a stay will do no harm to the public interest. *Dataphase Sys.,* 640 F.2d at

112; *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987).

In *Dataphase*, the Eighth Circuit Court of Appeals explained that the alternative test differs from the traditional test in its method of evaluating the elements of success on the merits and irreparable injury. The alternative test entails a sliding-scale inquiry. *Dataphase Sys.*, 640 F.2d at 113. The court explained that, if, absent a stay, the movant's chance of suffering irreparable injury is outweighed by the likely injury to the non-moving party if the Court grants the stay, then the movant faces a "heavy burden" of demonstrating that he is likely to prevail on the merits. *Id.* Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, his showing of success on the merits can be less. *Id.* Plaintiffs advocate the use of the alternative test. *See* Pl. Reply at 4.

### A. Irreparable Harm to Plaintiffs

To warrant a stay, Plaintiffs must first demonstrate that the Court's Order of March 27 will irrevocably and adversely change their claimed rights and powers before the Eighth Circuit Court of Appeals has an opportunity to determine the validity of the Order. *See Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir.1996) ("[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."); *Packard Elevator*, 782 F.2d at 114 ("The [petitioner] must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future. Further, the [petitioner] must show that the alleged harm will directly result from the action which the [petitioner] seeks to enjoin.") (citations and internal quotations omitted); JACK H. FRIEDENTHAL, ET AL., CIVIL PROCEDURE § 15.4 (2d ed. 1993); *see, e.g., English v. Cunningham*, 80 S.Ct. 18, 20, 4 L.Ed.2d 42 (1959). To be exact, Plaintiffs' arguments must satisfy at least two elements. First, the alleged threat of irreparable injury must be capable of occurring (and likely to occur or "imminent") between the effective date of the Order and the date when the court of appeals will likely rule on the validity of the Order. *See Iowa Utilities Bd.*, 109 F.3d at 425. Second, Plaintiffs must show that the disputed Order will directly cause the alleged irreparable injury. *Packard Elevator*, 782 F.2d at 114.

Plaintiffs argue that failure to enjoin approval of the settlement agreement would cause three injuries to their claimed rights and powers: (1) lost educational opportunities, such as the magnet programs, Pl. Memo. at 7–8,[1] (2) alienation of parents, students, and educators, *id.*,[2] and (3) denial of the children's "constitutional right to an 'effective' remedy," Pl. Reply at 2–3.[3] In sum, "the harm here is the removal from the schoolchildren of remedial provisions that are presently providing them with a constitutionally mandated remedy." Pl. Memo. at 5.

Notably, Plaintiffs leave the practical effect of a stay ambiguous. They fail to expressly indicate how a stay of the agreement pending appeal will afford them the relief they seek. Plaintiffs intimate, however, that a stay of the agreement would prevent the

---

1. *See* Pl. Memo. at 7–8 ("The harm to the schoolchildren from large budget reductions necessitated by the Agreement which result in lost educational programs is irreparable.... There is no denying that approval of the Agreement will mean substantial modifications to the magnet plan and the anticipation of a reduction in their choices at the entering grades ..., or the anticipation of the elimination of a child's chosen theme, will immediately begin to have ripple effects on the decision making of parents and children.")

2. *See* Pl. Memo. at 8 ("More harm results because approval of the Agreement signals parents that the future is unsettled—that they cannot be confident that there will be a KCMSD capable of providing a quality education at the end of three years because there is no reason to believe that KCMSD will have a means of replacing not only the State contribution to desegregation funding but the court-ordered portion of the tax-levy as well ... Recapturing alienated parents, students, and educators will be nearly impossible.")

3. *See* Pl. Reply at 2 ("Under the Agreement ... this Court will be required to adopt a remedy that is constrained not by effectiveness, but by how it coincides with KCMSD's need to reduce its budget by at least $55 million over three years, irrespective of effectiveness.").

KCMSD from implementing any extensive changes that may be grounded in its need to reduce the budget as a result of the agreement rather than in the need to effectively remedy the harms of the past discrimination.[4]

### 1. Lost Educational Opportunities

Plaintiffs first argue that approval of the agreement will cause budget cuts which will cause the loss of educational programs. Plaintiffs argument is unpersuasive for at least two reasons.[5] First, the proposition that educational programs will be irrecoverably dismantled between now and the date of the resolution of the appeal is speculative, at best. The agreement does not encompass any substantive plan for modifying the remedial program. It targets only funding. Thus, educational programs cannot be modified until a plan is developed and approved by the Court. It is exceedingly doubtful that such a plan could be developed, approved, and unalterably implemented before the Eighth Circuit judges the validity of the settlement agreement. Speculative doomsdaying is not grounds for a stay. *See Iowa Utilities Bd. v. F.C.C.,* 109 F.3d at 425; *Packard Elevator v. I.C.C.,* 782 F.2d at 115 (denying stay because irreparable harm was speculative and unsubstantiated by the record).

Second, the KCMSD astutely targets the weakness in Plaintiffs' causational link. Plaintiffs must show that approval of the agreement will promptly cause budget reductions which will promptly cause the alleged irreparable injury to the educational programs. Here, causation is lacking: The agreement will not be the cause of any imminent budget reductions nor any imminent changes to the educational programs. Plaintiffs fail to distinguish between the Court's rulings on unitary status and its approval of the settlement agreement, which were both included in the March 25 Order.

The settlement agreement provides for payment of $314 million over a three-year period. Thus, the settlement agreement ensures that the KCMSD will have ample funding for the next several years and will not precipitate budget reductions. Admittedly, however, budget reductions are imminent. Judge Clark's Order of March 25, 1997 forewarned the KCMSD that it was approaching unitary status and, consequently, it would have to swiftly begin preparation for self-sustainment without the court-ordered tax-levy. *See* Order of March 25, 1997 at 6, 31, 36–37; *see also* Order of Apr. 16, 1993 (ordering the KCMSD to rein in spending); Order of Sept. 13, 1989. Once the Court declares the school district unitary, the district will relinquish the court-ordered portion of the tax levy. Accordingly, prompt budget reductions are necessary, not because of the settlement agreement, but because the KCMSD's annual budget has escalated exorbitantly, to a level that it will be unable to maintain when the district finally achieves

---

4. The Court can find only one instance where Plaintiffs suggest the practical effect of staying the agreement and how that effect would give them relief: "Plaintiffs seek only a stay of the approval of the Agreement, not a stay of the District's planning for a self-sufficient future. Courts in several desegregation stay opinions have distinguished between 'implementation' and 'planning,' staying the former but requiring that the latter continue." Pl. Memo. at 9; *see also* Pl. Reply at 3 ("The KCMSD has no plan and budget for the next school year ... this Court must adopt a plan and a budget supporting the plan in short order. Whether that plan is constrained unconstitutionally by the Agreement matters immensely.").

5. The Court does not address whether the loss of particular educational programs, such as the magnet program, is a cognizable injury. It is highly questionable whether any of the active programs are "constitutionally mandated" as

part of an effective remedy. Thus, elimination or modification of particular programs—including the magnet program—might not be the basis of a charge of irreparable injury so long as the school system can show that it is pursuing an effective remedy to the extent practicable. *See Jenkins III,* 515 U.S. at ——, 115 S.Ct. at 2073, 132 L.Ed.2d at 111 ("[W]e must remember that a deserving end does not justify all possible means."). Such evidence was presented that a more practicable, efficient remedy could be created without sacrificing the effectiveness by restructuring the school system's programs. *See* Order of March 25, 1997 at 31 ("... within a two- to three-year period, the KCMSD can be reorganized in a way that will save many millions of dollars in staffing costs, transportation costs, and program expenses without sacrificing all of the gains which the KCMSD has made in eliminating racial isolation.").

unitary status and the Court withdraws supervision and the court-ordered portion of the tax levy.

Likewise, the agreement will not cause modifications to the educational programs, like the magnet program which Plaintiffs specifically target. The magnet program was designed to eliminate the racial-isolation-vestige of former unconstitutional discrimination by attracting white suburban children to the KCMSD. *Missouri v. Jenkins*, 515 U.S. 70, 91–92, 115 S.Ct. 2038, 2051, 132 L.Ed.2d 63, 83 (1995) [hereinafter *"Jenkins III"*]. Consequently, Plaintiffs argue that modification of the magnet program could result in the loss of the benefits of desegregated learning between now and the date when the court of appeals renders judgment on the validity of the settlement agreement. *See* Pl. Memo. at 8. However, immediate changes to the magnet program, even if practicable, would not be the result of the settlement agreement. The funding under the agreement would be sufficient to sustain the magnet program in its present state at least until the court of appeals rules on the validity of the agreement.[6] Nonetheless, the magnet programs will undoubtedly change. Judge Clark's Order of March 25, 1997 discussed the inefficiencies of the present magnet program [7] and the likelihood that the KCMSD will attain unitary status in several years, thereby losing the court-ordered tax-levy. Thus, the KCMSD will almost certainly consolidate the magnet program to prepare for self-sufficiency after court-supervision is withdrawn. Furthermore, in *Jenkins III*, the Supreme Court held that the goal of attracting white suburban children to the KCMSD through "desegregative attractiveness" was unconstitutional. 515 U.S. at 94, 115 S.Ct. at 2052, 132 L.Ed.2d at 84. Accordingly, any changes in the magnet pro-

gram will reflect the state of the law and common-sense efficiencies.

### 2. Alienation of Parents, Students, and Educators

Plaintiffs next argue that approval of the agreement "signals that the future is unsettled," which could lead to the alienation of parents, students, and educators. Even if unsettled expectations were an injury that the Court would recognize as redressable, however, the proposition that the approval of the agreement will cause unsettled expectations which will cause parents, students, and teachers to leave the school district before the court of appeals can rule on the validity of the agreement is highly speculative and not a basis to enjoin approval of the agreement. *See Iowa Utilities Bd. v. F.C.C.*, 109 F.3d at 425; *Packard Elevator v. I.C.C.*, 782 F.2d at 115.

Furthermore, any unsettled expectations about the future viability of the school district would be caused not by the settlement agreement but by the prospect of withdrawal of court supervision; the concomitant abolishment of the court-ordered portion of the tax levy; and by the record of incompetent management of the school district, which portends a tumultuous return of power to local authorities.[8] In fact, approval of the settlement agreement ensures economic stability for the next three to five years.[9] These several years will afford the school district time to prepare to become self-sufficient so that the return of power to local authorities will be less tumultuous than if the Court had withdrawn supervision without warning.

### 3. Effective Remedy

It is the courts' duty to ensure that school systems make a good-faith effort to eliminate the vestiges of their prior de jure segregation to the extend practicable. *Jenkins III*,

---

6. *See* Order of March 25, 1997 at 40 (stating that, if the school district "receives $320 million from the Agreement and equalizes spending over a five-year period, the KCMSD would still rank as one of the top ten spending districts in the nation.").

7. *See* Order of March 25, 1997 at 40–41.

8. *See, e g.*, Order of March 25, 1997 at 45 ("[T]he Court cannot fail to see excess expenses in the

top-heavy administration in the KCMSD. While extra expenses could be justified with superior performance, the KCMSD presents an opposite picture: large expenses and inadequate performance in many areas."); *id.* at 53 ("Many witnesses at the hearing expressed concern at the size and inefficiencies of the KCMSD administration.").

9. *See* Order of March 25, 1997 at 40.

515 U.S. at ——, 115 S.Ct. at 2050, 132 L.Ed.2d at 82. Here, the remaining vestiges of prior de jure segregation are a system-wide reduction in student achievement and the existence of racially identifiable schools. *Id.* Plaintiffs argue that failure to enjoin the approval of the agreement will cause irreparable injury to the effectiveness of the KCMSD schoolchildren's remedy of these vestiges before the court of appeals can determine the validity of the disputed Order which approved the agreement.

Plaintiffs' argument that the schoolchildren's right to an effective remedy is at risk is merely a conceptual paraphrase of the previous argument that children's educational opportunities are at risk. Consequently, the former suffers the same infirmities as the latter. As discussed above, it is exceedingly doubtful that a plan to modify the remedial programs could be developed, approved, and unalterably implemented before the Eighth Circuit Court of Appeals can judge the approval of the settlement agreement. This Court will not base a stay on improbable consequences of conjecture. *See Iowa Utilities Bd. v. F.C.C.,* 109 F.3d at 425; *Packard Elevator v. I.C.C.,* 782 F.2d at 115.

Furthermore, Plaintiffs' argument also bears the same causational defect as their previous argument. The State's obligation under the agreement will provide ample funding over the next several years, and certainly will provide ample funding until the Eighth Circuit can rule on the validity of the disputed Order. Thus, it is not approval of the agreement which would cause modification of the remedial plain. Rather, it is the KCMSD's anticipation of attaining unitary status and the attendant consequences that will precipitate eventual modifications to the remedial plan. Additionally, as discussed above, the Supreme Court's rulings in *Jenkins III* will cause continued modifications of the remedy.

Finally, Plaintiffs' argument is premised on two flawed presumptions: It presumes that this Court will neglect its duty to de-

mand good-faith pursuit of an effective yet practicable remedy and it presumes that effectiveness is measured by the number of dollars injected into the school system. As to the former presumption, the Court adamantly assures Plaintiffs that it will not vary from the course demarcated in *Jenkins III.* The latter presumption exposes an underlying misconception that has plagued the remedial phase of this litigation. Money is a means, not an end. Though it can provide opportunities, it is not tantamount to an effective remedy. *See, e.g.,* Order of March 25, 1997 ("While extra expenses could be justified with superior performance, the KCMSD presents an opposite picture: large expenses and inadequate performance in many areas."); *id.* at 31 ("[W]ithin a two- to three-year period, the KCMSD can be reorganized in a way that will save many millions of dollars in staffing costs, transportation costs, and program expenses without sacrificing all of the gains which the KCMSD has made in eliminating racial isolation."); *Jenkins III,* 515 U.S. at 138, 115 S.Ct. at 2073, 132 L.Ed.2d at 111 ("[W]e must remember that a deserving end does not justify all possible means."). Based on the foregoing, the Court rejects Plaintiffs' arguments that approval of the settlement will precipitate irreparable injuries before the court of appeals can rule on the validity of the disputed Order.

**B. Harm To Other Interested Parties**

Plaintiffs assert that other interested parties will not be significantly harmed by a stay of the approval of the agreement pending appeal. *See* Pl. Mem. at 9–10; Pl. Reply at 10. Conversely, the State and the KCMSD argue that a stay would cause immediate financial turmoil. No court-order approving funding for the 1997–98 school year exists. Without the money payable under the agreement, KCMSD will receive no desegregation funding from the State at the end of this fiscal year, which ends June 30, 1997. Consequently, a stay of the agreement would require an immediate hearing on funding.[10]

---

**10.** By suggesting that the State may be required to pay more money than the amount required by the agreement, Plaintiffs implicitly support the necessity of a prompt hearing to determine the funding obligations of the State. *See* Pl. Mem. at

9 ("The only cost to the State is financial, but any additional money it would pay it can get back because, if approval of the Agreement is ultimately upheld, the State's financial payments are limited and it would have simply been spent

Such a hearing would cause the State and the KCMSD to relapse to the roles of adversaries and would dissipate resources that undoubtedly could be better spent. Unlike Plaintiffs' alleged injuries, a stay of the settlement agreement would cause financial turmoil before the court of appeals could determine the validity of the order approving the agreement. Thus, absent a stay of the approval of the agreement pending appeal, Plaintiffs' chance of suffering irreparable injury is slim (if even existent) compared to the likelihood that such a stay would immediately harm the other interested parties.

### C. Success on the Merits

Because the likely injury to the KCMSD and the State if the Court grants the stay outweighs Plaintiffs' chance of suffering irreparable injury, Plaintiffs face a substantial burden of demonstrating that they are likely to prevail on the merits. *See Dataphase Sys.,* 640 F.2d at 113 (discussing the alternative, sliding scale test). Plaintiffs argue that they have satisfied their burden because (1) approval of this type of an agreement is unprecedented and similar cases approving settlements are distinguishable and (2) the Court's approval of the agreement misapplies *Jenkins III.*

Approval of settlement agreements in school desegregation cases are not uncommon. *See, e.g., Liddell v. Bd. of Educ.,* 567 F.Supp. 1037, 1042 (E.D.Mo.1983); *aff'd in part,* 732 F.2d 1294 (7th Cir.1984); *Armstrong v. Bd. of School Directors,* 471 F.Supp. 800, 804 (E.D.Wis.1979), *aff'd,* 616 F.2d 305 313 (7th Cir.1980). Nonetheless, the Court's approval of this settlement agreement, releasing the State from joint

and several liability for past acts of unconstitutional discrimination without consent of the Plaintiffs, is indeed unprecedented.[11] The Court can locate no other desegregation case involving jointly liable constitutional violators in which the court released one co-violator while refusing to declare unitary status and retaining jurisdiction over the other co-violator.[12] Also unprecedented, however, is the extent and expense of the KCMSD's desegregation effort and the seeming irresponsibility and lack of forethought with which millions of dollars were extracted from the state treasury for over ten years. *See* Order of March 25, 1997 at 22–24 (identifying numerous deficiencies within the KCMSD and criticizing it as a "top-heavy" administration); *Jenkins III,* 515 U.S. at 79–80, 115 S.Ct. at 2044–45, 132 L.Ed.2d at 74–75 (discussing expense of the remedial program); *id.,* 515 U.S. at 98, 115 S.Ct. at 2054, 132 L.Ed.2d at 87 (discussing the self-perpetuating characteristic of the expanding remedial program); *see also Missouri v. Jenkins,* 495 U.S. 33, 76, 110 S.Ct. 1651, 1676, 109 L.Ed.2d 31 (1990) (Kennedy, J., concurring) ("The plaintiffs and KCMSD might well be seen as parties that have joined forces apparently for the purpose of extracting funds from the state treasury.") (internal quotations omitted). These unique facts produced a unique (and thus "unprecedented"), but not unprincipled, result. The fact that a court has never previously addressed this precise scenario in no way undermines the Court's judgment and, consequently, does little to support Plaintiffs' argument that they will likely prevail on the merits on appeal.

---

sooner, but not more altogether."). Somehow, however, Plaintiffs fail to recognize this as an immediate harm to an interested party caused by a stay of the agreement. *See id.* ("There is no harm to the other interested parties that would result if a stay was granted.").

**11.** Calling this agreement a "settlement agreement" is somewhat misleading. Plaintiffs, the injured parties, were not a party to the agreement. Thus, they did not consent to release the defendant State from liability. Instead, the agreement was primarily between the State and the KCMSD, the two wrongdoers. Properly understood, the approval of the agreement was a court-determination to release the State from

liability over the objections of Plaintiffs—it was not a consensual settlement agreement.

**12.** The absence of cases precisely on point, however, is not rare, nor is it tantamount to the absence of analogous cases and evident guiding principles. Under the law and facts of this case, *Freeman v. Pitts* is analogous and *Jenkins III* offers evident guidance. *See Freeman v. Pitts,* 503 U.S. 467, 485, 112 S.Ct. 1430, 1442, 118 L.Ed.2d 108 (1992) (framing the principal issue as "whether a district court may relinquish its supervision and control over those aspects of a school system in which there has been compliance with a desegregation decree if other aspects of the system remain in noncompliance").

Likewise, Plaintiffs do not persuade this Court that they are likely to succeed on their argument that the Court misapplied Supreme Court precedent, including *Jenkins III,* when it released the State from liability before granting the school district unitary status. In *Jenkins III,* the Supreme Court set forth what it identified as the "ultimate inquiry" when determining whether a constitutional violator remains liable for its past acts of discrimination: "whether the constitutional violator has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination have been eliminated to the extent practicable." *Jenkins III,* 515 U.S. at 89, 115 S.Ct. at 2049, 132 L.Ed.2d at 81. Plaintiffs correctly point out that the "ultimate inquiry" is phrased in the conjunctive. They also point out that the school district has earned only partial unitary status, which means that vestiges of discrimination have not been eliminated to the extent practicable. Accordingly, they argue that, because vestiges remain, the Court mistakenly released the State from liability upon merely a showing of good faith compliance with the desegregation order. This argument, however, misrepresents *Jenkins III* and the basis of this Court's judgment.

*Jenkins III* not only identified the ultimate inquiry, but also directed the district court to look to *Freeman v. Pitts* for guidance and to "consider that the State's role with respect to the quality education programs has been limited to the funding, not the implementation, of those programs." *Jenkins III,* 515 U.S. at ——, 115 S.Ct. at 2055, 132 L.Ed.2d at 88 (citing *Freeman v. Pitts,* 503 U.S. 467, 495–96, 112 S.Ct. 1430, 1448, 118 L.Ed.2d 108 (1992)).

In *Freeman v. Pitts,* the Supreme Court held that a district court may relinquish its supervision and control over those aspects of a school system that comply with a desegregation decree, even though other aspects of the system remain in noncompliance. By analogy, a district court is authorized to relinquish supervision over a constitutional violator which has complied with a desegregation decree, even though its co-violator has not.

*Freeman* also stressed that disparities among the races are not remediable unless those disparities have some manifest causal link to the de jure violation. 503 U.S. 467, 495–96, 112 S.Ct. 1430, 1448, 118 L.Ed.2d 108 (1992);[13] *see also Jenkins III,* 515 U.S. at 117, 115 S.Ct. at 2063, 132 L.Ed.2d at 98–99 (Thomas, J., concurring).[14] For example, a causal link may be absent where present disparities result from discriminatory forces, such as socio-economic factors, which operate independently of the State or the KCMSD. *Jenkins III,* 515 U.S. at 117, 115 S.Ct. at 2063, 132 L.Ed.2d at 99 (Thomas, J., concurring). Also, the span of time between the present disparities and the past discriminatory conduct may attenuate the causal link. *Id. Freeman's* emphasis on causation and *Jenkins III'*s emphasis on

---

**13.** In one sense of the term, vestiges of past segregation by state decree do remain in our society and in our schools. Past wrongs to the black race, wrongs committed by the State and in its name, are a stubborn fact of history. And stubborn facts of history linger and persist. But though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities. The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the de jure violation being remedied.... The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith.

*Freeman,* 503 U.S. at 495–96, 112 S.Ct. at 1448.

**14.** In order for a "vestige" to supply the ground for an exercise of remedial authority, it must be clearly traceable to the dual school system.... District Courts must not confuse the consequences of de jure segregation with the results of larger social forces or of private decisions. It is simply not always the case that demographic forces causing population change bear any real and substantial relationship to a de jure violation ... As state-enforced segregation recedes farther into the past, it is more likely that these kinds of continuous and massive demographic shifts will be the real source of racial imbalance or of poor educational performance in a school district. And as we have emphasized, it is beyond the authority and beyond the practicable ability of the federal courts to try to counteract these social changes.

*Jenkins III,* 515 U.S. at 117–18, 115 S.Ct. at 2063, 132 L.Ed.2d at 98–99 (Thomas, J., concurring) (internal quotations and citations omitted).

"good faith" and "practicability" demonstrate the Supreme Court's judgment that the Constitution does not obligate school systems to eradicate every racial disparity and every lingering effect of prior discrimination.[15] Further, in this context where there are co-violators, *Jenkins III*'s emphasis on each violator's role during the remedial phase of the case demonstrates the Supreme Court's judgment that the Constitution will not hold defendants accountable for a co-defendant's deficient performance in the remedial phase. Instead, the two cases essentially establish a standard for determining when a wrongdoer's past discrimination is the proximate cause of racial disparities within the school system. If the constitutional violator has made a good faith effort to take all practicable steps within its control to eliminate vestiges of its prior discrimination, that violator is not the proximate cause of any racial disparities even if it is, in some sense, a direct cause. The fact that disparities among the races linger is relevant to whether both wrongdoers have taken all practicable steps in their good faith, remedial effort and, thus, relevant to whether the school district has attained unitary status. Lingering disparities, however, are not dispositive of a wrongdoer's continued individual liability nor of a school district's achievement of unitary status. This standard properly balances the court's equitable power to compel a constitutional violator to remedy its wrong with the constitutional restraints of separation of powers and federalism. *See Jenkins III*, 515 U.S. at 88, 115 S.Ct. at 2049, 132 L.Ed.2d at 80 (setting forth three-part framework to aid district courts' equitable balancing of interests); *id.* at 96–98, 97–100, 115 S.Ct. at 2053–54, 2054–55, 132 L.Ed.2d at 86, 87 (indicating that the restraints of federalism and separation of powers limit the court's exercise of equitable power); *id.* at 114–15, 115 S.Ct. at 2062, 132 L.Ed.2d at 97 (O'Connor, J. concurring) (same); *id.* at 128–32, 115 S.Ct. at 2069–71, 132 L.Ed.2d at 107–08 (Thomas, J. concurring) (same). It requires the wrongdoer to take corrective action while ensuring a seasonable restoration of power to state and local authorities, which are politically accountable and better-designed to manage the day-to-day operations of a school district. Refusing to hold a constitutional violator responsible for its co-violator's deficient performance in the remedial phase likewise strikes an appropriate balance among the identified interests. Emphasizing a co-violator's remedial role ensures that power is restored to at least one politically accountable body once it has demonstrated compliance with the Constitution.

Applying these principles to this case, the Court did not misapply *Jenkins III*'s two-part ultimate inquiry. Rather, the Court applied the test in light of the Supreme Court's later direction to consider the State's limited responsibility during the remedial phase. *See Jenkins III*, 515 U.S. at 99–100, 115 S.Ct. at 2055, 132 L.Ed.2d at 88. *Jenkins III*'s directive plainly suggested that the State's limited responsibility for funding

---

**15.** Prior Supreme Court cases suggested that state and local governments who had mandated dual school systems did have such an obligation to extinguish all effects of prior discrimination. *See, e.g., Green v. County School Bd. of New Kent County*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) ("School boards ... operating state-compelled dual systems [are] clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."). *Green*, which followed *Brown I* and *Brown II*, was the first Supreme Court case to hold that the Constitution obligated governments which had mandated dual school systems to take affirmative, corrective steps to integrate the schools. *Compare Brown v. Bd. of Educ.*, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) ("*Brown I*") (stating that "[s]eparate educational facilities are inherently unequal," but failing to articulate what remedial action was required of the school systems) and *Brown v. Bd. of Educ.*, 349 U.S. 294, 300–01, 75 S.Ct. 753, 756–57, 99 L.Ed. 1083 (1955) ("*Brown II*") (stating that the school systems were required to "make a prompt and reasonable start" toward "achiev[ing] a system of determining admission to the public schools on a nonracial basis") *with Green*, 391 U.S. at 437–38, 88 S.Ct. at 1693–94. Since *Green*, the Supreme Court has gradually chiseled a more definite standard of the school systems' corrective duties, as illustrated in *Freeman v. Pitts* and *Jenkins III*. *See, e.g., Freeman*, 503 U.S. at 487–88, 112 S.Ct. at 1444 (defining "unitary" status and indicating that it can be attained before a school district eliminates every remote vestige of prior discrimination); *Jenkins III*, 515 U.S. at 88, 115 S.Ct. at 2049, 132 L.Ed.2d at 81 (indicating that unitary status is achieved when a wrongdoer proves that it has complied with the court decree in good faith and has done everything practicable to remedy the effects of the prior discrimination).

the remedial program attenuated the causal link between the state-mandate of segregation and present racial disparities in the school district and also between the prior conduct and the school district's failure to achieve unitary status. Thus, it was this Court's task to inquire whether the State had, in good faith, done everything practicable within its responsibility (i.e., funding) to eliminate the vestiges of its prior order of segregation. If so, the State would not be legally responsible (i.e., not a proximate cause) for racial disparities within the school district and, consequently, continued court-supervision over the State would be an abuse of the Court's equitable power.

The State has been responsible only for funding the remedial phase of this case. It has contributed approximately $1.2 billion to the KCMSD and has agreed to pay an additional $320 million over the next three years. KCMSD, on the other hand, was responsible for implementing the remedy. As discussed previously, KCMSD's past performance of its duties was deficient and wasteful. Furthermore, evidence showed that neither the State nor the KCMSD were responsible for some demographic and socio-economic factors that have perpetuated lingering disparities within the KCMSD. Finally, the State has not mandated segregated schools since before 1954. On the other hand, although the Court made no relevant factual findings on the issue, it suggested that the State's over-litigious record may have been in bad faith and may have causally contributed,to the remaining disparities in the school district. *See* Order of March 25, 1997 at 44. The Court also found that the State was partially responsible for some of the discriminatory social forces that perpetuated racial disparities in the school district. *See* Order of March 25, 1997 at 8 (stating that a number of discriminatory state laws had the effect of

placing the State's imprimatur on racial discrimination and, thus, had contributed to the creation and maintenance of a dual housing market, which perpetuated lingering disparities within the KCMSD (citing the findings in *Jenkins v. Missouri*, 593 F.Supp. 1485, 1503 (W.D.Mo.1984))). The State's discriminatory acts, however, occurred thirty and forty years ago. *See Jenkins*, 593 F.Supp. at 1503. The KCMSD's deficient performance, the socio-economic factors, the State's litigious record, the State's acts which fueled discriminatory social forces, and the span of time since the last discriminatory acts were relevant to determining whether racial disparities in the school district remained because of (i) the KCMSD's bad faith failure to take all practicable steps to remedy the vestiges, (ii) the State's bad faith failure to take all practicable steps to remedy the vestiges, or (iii) both, or (iv) because of some other factors for which neither the State nor the KCMSD were legally responsible.

Evidence of the KCMSD's unfocused implementation of the remedial program for eleven years, the role of discriminatory forces independent of either the State or the KCMSD, and the span of time between the State's prior order of segregation and the present racial disparities amply demonstrated that the State, which had expended millions of dollars, was not legally responsible for any remaining disparities nor for the school district's failure to achieve unitary status. The State's good faith expenditure of approximately $1.2 billion and its promise to pay an additional $320 million over the next three years satisfied the State's obligation to do everything practicable within its realm of responsibility to eliminate remaining vestiges of its past mandate of segregation.[16] Consequently, retaining control over the State would have been an abuse of the Court's

16. *See* Order of March 25, 1997 at 11 (stating that, although the school district has not yet achieved unitary status, the State can no longer be held legally responsible for the remaining vestiges of prior discrimination because it has never been responsible for the implementation of the remedial plan); *id.* at 37 (paraphrasing the State's argument, which ultimately prevailed, that it fulfilled its remedial obligations under the Constitution by providing the KCMSD with suffi-

cient funds with which the KCMSD should have been able to implement programs to eliminate the vestiges of prior discrimination); *id.* at 39, 43, 44 (noting that the State has been responsible only for funding the remedy, not for implementing it); *id.* at 43–44 (indicating that many of the goals of programs funded by the State have already been reached); *id.* at 48 ("[The KCMSD's] deficiencies in performance cannot be blamed on lack of financial resources.").

equitable power. The KCMSD, on the other hand, had not demonstrated that it had, in good faith, done everything practicable within its power to eliminate the vestiges of its prior discrimination. Consequently, the Court refused to relinquish control over the KCMSD and refused to grant unitary status.

Plaintiffs do not contend that the Court lacks equitable authority to modify its own injunctions. Supreme Court precedent would preclude such an argument. *See, e.g., Freeman,* 503 U.S. at 488, 112 S.Ct. at 1444–45 ("A federal court in a school desegregation case has the discretion to order an incremental or partial withdrawal of its supervision and control."). Thus, their challenge must be to the Court's reading of *Jenkins III* or to the primary underpinning of the Court's decision to release the State from liability, which was a predominantly fact-based judgment about good faith, practicability, and legal causation. However, Plaintiffs reading of *Jenkins III* is not persuasive and does not convince the Court that they are likely to succeed on the merits of their appeal. Further, although the fact-based judgments have serious consequences, they involve issues that district courts are accustomed to resolving.[17] Consequently, based on the plain implications of *Jenkins III* and on the sound judgments of Judge Clark discussed above, the Court finds that Plaintiffs have not satisfied their burden of demonstrating the likelihood that they will succeed on the merits of their appeal.

### D. Public Interest

The public—including the schoolchildren, parents, and faculty—have an interest in an orderly, well-planned transfer of power from the Court to the state and local government.

It is obvious that Judge Clark contemplated this interest and, consequently, seriously considered the parties' arguments that fiscal chaos would ensue if he declared unitary status without much forewarning. *See, e.g.,* Order of March 25, 1997 at 4–5. It is equally obvious that Judge Clark recognized that *Jenkins III* did not approve of the history of this remedy. *See, e.g., id.* In deference to the dictates of *Jenkins III,* he repeatedly indicated that he expects the KCMSD to attain unitary status within the next three years and, with respect to some areas, much sooner. These pronouncements were not unfounded speculation. Judge Clark supervised the remedy for eighteen years and convened a rigorous, three-week hearing on the matter. Thus, Judge Clark's approval of the settlement and substantial forewarning about the impending finding of unitary status complies with the legal directives of the Supreme Court while still avoiding turmoil of an abrupt declaration of unitary status and withdrawal of court-supervision.[18] It also gives the KCMSD ample funding to begin its journey to self-sufficiency and a non-adversarial companion in the State to offer guidance.

### III. Order

Based on the foregoing, it is hereby ORDERED that Plaintiffs' motion under Federal Rule of Civil Procedure 62(c) for a stay of the Court's approval of the settlement agreement pending appeal is DENIED.

---

**17.** Whether a constitutional violator remains liable for his past acts of discrimination is a mixed question of law and fact. Consequently, the district court's factual findings are subject to the clearly erroneous standard of review, while the district court's legal conclusions are subject to de novo review. *McCauley–Bey v. Delo,* 97 F.3d 1104, 1105 (8th Cir.1996). Accordingly, Plaintiffs will have a substantial burden challenging the Court's factual findings. This standard of review supports the conclusion that Plaintiffs are not likely to succeed on the merits of their appeal.

**18.** Just as a court has the obligation at the outset of a desegregation decree to structure a plan so that all available resources of the court are directed to comprehensive supervision of its decree, so too must a court provide an orderly means for withdrawing from control when it is shown that the school district has attained the requisite degree of compliance. A transition phase in which control is relinquished in a gradual way is all appropriate means to this end.
*See Freeman,* 503 U.S. at 489–90, 112 S.Ct. at 1445.